UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

DONALD HERB JOHNSON,

     Petitioner,

v.

WARDEN RANDY WHITE,

     Respondent.

Civil Action No. 7:14-117-KKC

**MEMORANDUM OPINION
AND ORDER**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

In 1994, Donald Herb Johnson pled guilty in a Kentucky state court to murder, burglary, robbery, and sexual abuse, and the trial judge sentenced him to death. Johnson appealed his case, but the Kentucky Supreme Court eventually affirmed his convictions and sentence. Johnson then filed a state collateral attack motion, but, even though his case moved up and down the state judicial system, the Kentucky courts ultimately concluded that he was not entitled to relief.

Having exhausted his options in state court, Johnson now seeks habeas relief from this Court pursuant to 28 U.S.C. § 2254. Johnson puts forth several different claims in his petition. He argues that his guilty plea was not entered knowingly, voluntarily, and intelligently; the trial judge failed to consider and give effect to all evidence presented in mitigation of a death sentence; the state courts erred by permitting a retrospective competency hearing in his case; and he was incompetent when he pled guilty. Johnson also asserts three ineffective assistance of counsel claims and argues that his guilty plea was induced by his belief that there was a deal

in which the trial judge would not sentence him to death.  Considered through the deferential lens of the Antiterrorism and Effective Death Penalty Act (AEDPA), each of Johnson's claims are unavailing.  Thus, the Court will deny his petition.

## I.  BACKGROUND

In November of 1989, Johnson brutally beat, stabbed, mutilated, and tortured 61-year-old Helen Madden to death in the supply room of the laundromat where she worked.  Helen was so horrifically disfigured that her co-worker of 13 years was unable to identify her body.  State law enforcement officials subsequently arrested Johnson and charged him with multiple crimes, including murder, first-degree robbery, first-degree burglary, and two counts of first-degree sexual abuse.  Attorneys Mike Williams and Kelly Gleason represented Johnson before the Floyd County Circuit Court, and Johnson first entered a not guilty plea.  *See Johnson v. Commonwealth*, 412 S.W.3d 157, 158-59 (Ky. 2013) (discussing the factual and procedural history).

### A.  Pretrial Events Regarding Johnson's Competency

During the pretrial stage of the litigation, the parties and the trial court considered Johnson's competency to proceed.  *See Johnson v. Commonwealth*, 103 S.W.3d 687, 692 (Ky. 2003) (summarizing the relevant events).  The defense team hired Dr. Eric Engum, a neuropsychologist, who performed a two day psychological and neuropsychological examination of Johnson.  *See id.*  Then, Dr. Frank Deland of the Kentucky Correctional and Psychiatric Center (KCPC) evaluated Johnson and concluded that he was competent to go forward.  *See id.*  Nevertheless, the defense team hired a second mental health professional,

Dr. Robert Berland, who also examined Johnson. *See id.* Dr. Berland issued a report that raised questions about Johnson's mental state but did not make a specific determination as to whether he was competent. *See id.* The trial court then ordered that Johnson be transported back to the KCPC, examined once again, and given medical treatment, including care for any medical conditions. *See id.* The prosecution also requested that Johnson undergo a formal competency evaluation at the KCPC, in accordance with state law. *See id.* Consistent with that request, Dr. Deland examined Johnson, and, in June of 1994, he filed a report finding that Johnson was competent to proceed. *See id.*

### B.  *Johnson's Guilty Plea*

On June 17, 1994, Johnson appeared at a hearing before Floyd County Circuit Court Judge John David Caudill to enter an unconditional guilty plea to murder, first-degree robbery, first-degree burglary, and two counts of first-degree sexual abuse. *See Johnson*, 412 S.W.3d at 158-59. At the hearing, defense counsel conceded that Johnson was competent. *See Johnson*, 103 S.W.3d at 692. The trial court relied on that concession as well as its own review of the psychological reports in the record to conclude that Johnson was indeed competent to go forward. *See id.* However, the trial court did not hold a formal competency hearing and, instead, proceeded with Johnson's change of plea. *See id.*

The trial court did not require Johnson to compete a written guilty plea form, though he did file a lengthy memorandum in advance of the hearing in which he discussed his rights to a trial by jury on both guilt and punishment and expressed his desire to waive those rights and proceed before the trial court. *See id.* at 691-92; *see also* Johnson's Pre-Plea Mem., June

9, 1994.[1]  This was true despite the fact that Johnson had previously contested the charges against him and even moved to suppress certain incriminating statements he had made to police.  *See* Johnson's Mot. to Suppress, June 13, 1990.[2]  Johnson was ready to plead guilty, and the trial court began the plea colloquy.

Attorney Mike Williams began by saying, "Judge, after speaking with our client recently and over the last three and a half . . . years since I've been involved in the case, it's now his intention to withdraw his previously entered plea of not guilty . . . and enter a plea of guilty."  Tr. of Guilty Plea Hr'g, June 17, 1994, at 4-5.[3]  The trial court then asked Johnson multiple questions related to his legal circumstances and the consequences of pleading guilty. *See id.* at 6-15.  At one point, the trial court had the following exchange with Johnson:

> Trial Court:  Mr. Johnson, your counsel has indicated to the Court that you wish to change your previously entered not guilty pleas on the indictments which have been issued against you.  I want to inform you, Sir, at this time that if you do in fact change your pleas that you will be waiving certain rights guaranteed to you by the Constitution.  Among the rights that you would be waiving, Sir, would be the right to a speedy and public trial; at which time you would be represented by counsel and counsel would be appointed for you if you could not afford to do so; and the right to require the Commonwealth to prove your guilt beyond a reasonable doubt.  Do you understand that you would be waiving that right?

> Defendant: Yes, Sir.

---

[1] This memo is part of the state court record and is located in the conventional filing at R. 15 in this case.  There, it can be found on the second compact disc (CD #2) (also referred to as a DVD), in a folder labeled "Box 1," in a PDF labeled "2006-CA-958-MR_Johnson_Donald_89-CR-115_Vol XVI of XVII."  The memo is located on PDF pages 84-109 (handwritten pages 2370-2395).  It is also cited in the Respondent's brief at R. 20 on page 16.

[2] This motion is located at R. 15, CD #2, Box 1 in a PDF labeled "2006-CA-958-MR_Johnson_Donald_89-CR-115_Vol II of XVII."  The motion can be found on PDF pages 45-46 (handwritten pages 177-78), and it is also cited in the Respondent's brief at R. 20 on page 16.

[3] This transcript is located at R. 15, CD #2, Box 7 in a PDF labeled "2011-SC-137_Johnson_Donald_89-CR-115_Transcript of Evidence June 17 1994."

4

Trial Court:  Do you likewise understand that you would be waiving the right to confront and cross examine any witnesses against you?

Defendant:  Yeah.

Trial Court:  Do you further understand that you would be waiving the right to present evidence in your own defense, including the right to subpoena witnesses at no cost to you if you could not afford to do so?

Defendant:  Yes.

*Id.* at 8-9.

The trial court then discussed the various charges against Johnson and asked him if he understood the potential penalty for each crime.  *See id.* at 9-11.  Johnson acknowledged the sentences he was facing, including the fact that he could be sentenced to death on the murder charge.  *See id.* at 10.  The trial court then asked Johnson how he pled to each of the charges against him, and Johnson said he was guilty.  *See id.* at 12-15.  The trial court accepted Johnson's guilty pleas, finding that they were "made freely, knowingly, voluntarily, and intelligently" and further finding that he was "represented by competent counsel" and "aware of the nature of this proceeding and all matters contained in the record."  *Id.* at 15.

### C.  Events After the Trial Court Accepted Johnson's Guilty Plea But Prior to Sentencing

Although the trial court had accepted Johnson's guilty plea, the parties disagreed as to whether he should be sentenced by the judge or a jury.  *See Commonwealth v. Johnson*, 910 S.W.2d 229 (Ky. 1995) (discussing the parties' positions on the matter). The prosecution, which was seeking the death penalty, specifically asked for jury sentencing.  *See id.*  However, Johnson strongly objected, insisting that he was entitled to have his punishment fixed by the

trial court without the recommendation or intervention of a jury.  *See id.*  The parties filed briefs on the issue, and the trial court heard their arguments.  *See id.*  The trial court then decided not to empanel a jury because it determined that it could sentence Johnson directly, as he had requested.  *See id.*  The prosecution, however, remained adamant that a jury should make the sentencing decision, and, therefore, it filed an interlocutory appeal, which Johnson opposed.  *See id.* at 229-30.

The Kentucky Supreme Court reversed the trial court's judgment because it held that capital cases require a jury verdict on sentencing except upon the agreement of both parties. *See id.* at 231.  The court explained that "[i]n death penalty cases, jury sentencing is deeply ingrained in Kentucky law.  By virtue of statutes, rules of Court, and decisions, participation by a jury in this momentous governmental event has been regarded as indispensable except upon concurrence of all involved."  *Id.* (citations omitted).  The court also pointed out that "[w]hile the importance of a defendant's right to insist upon jury sentencing is obvious, the significance of the public's right of participation in the process should not be taken lightly." *Id.*  The court then said, "As the death penalty is a possible punishment for only the most heinous of crimes, and with due regard for the legitimate public interest in law enforcement, the verdict of a jury should be heard by the court prior to final sentencing *except upon agreement of all parties*."  *Id.* (emphasis added).  Since there was no such agreement in place at the time, the Kentucky Supreme Court concluded that the prosecution could insist on a jury-recommended sentencing over Johnson's objection.  *See id.*  Thus, it remanded Johnson's case for a jury sentencing hearing.  *Id.*

Following the remand, Johnson moved to withdraw his guilty plea, but the trial court denied his request. *See Johnson*, 412 S.W.3d at 159 (reviewing the events at this stage in the litigation). Then, in 1997, Mike Williams and Kelly Gleason withdrew as Johnson's attorneys, and another lawyer, Vincent Yustas, was assigned to the case. *See id.* Yustas worked to get the prosecution to agree to a judge-imposed sentence instead of the jury sentencing it could demand. *See id.* Ultimately, Yustas was successful, and the prosecution agreed to a sentence imposed solely by the trial court, i.e., without the intervention of a jury, consistent with the Kentucky Supreme Court's latest decision. *See id.*

### D.  Sentencing Hearing (Penalty Phase)

The sentencing hearing began on September 2, 1997, and it lasted for multiple days. Tr. of Sent. Hr'g, Sept. 2-5, 1997.[4] The prosecution first introduced extensive testimonial and documentary evidence regarding the nature and circumstances of Johnson's crimes. It offered testimony from eighteen witnesses, including but not limited to individuals who discovered and identified the victim, people who interacted with Johnson before and after he committed his crimes, and multiple investigating officers and medical examiners, among others. *See id.* at vols. I-IV. The prosecution also introduced numerous exhibits, including photographs of the victim and crime scene, as well as other evidence. *See id.* at vols. VIII and IX.

---

[4] This transcript is located at R. 15, CD #2, Box 5, and, in total, it consists of 17 separate PDFs. The first relevant PDF is labeled "2011-SC-137_Johnson_Donald_96-CR-47_Partial Transcript of EvidenceVol I of XVII." That volume includes a "General Index" that lists the "evidence in chief for the Commonwealth" and the "evidence in chief for the Defendant," including the parties' respective exhibits. The volumes then continue through the seventeenth PDF, which is labeled "2011-SC-137_Johnson_Donald_96-CR-47_Partial Transcript of Evidence Vol XVII of XVII."

The defense then presented evidence in mitigation. This included Johnson's own testimony and the testimony of six other witnesses, as well as over two dozen exhibits. *See id.* at vols. IV-VII, X-XVII. Through this evidence, the defense first emphasized that Johnson was only 22 years old when he committed the crimes in question, had an incredibly dysfunctional childhood marred by abuse, and suffered from multiple mental health disorders. *See id.* Indeed, the defense witnesses testified that Johnson's father put beer in his bottle when he was a baby and physically and sexually abused him for years; his mother abandoned him when he was only 11 years old; he moved 30 times and attended 16 different schools; and he grew up abusing drugs and alcohol. *See id.* Even the prosecution's own expert witness later described Johnson's upbringing as "hideous" and said it was "about as bad as you can expect here in America." Tr. of Sent. Hr'g, Sept. 6, 1997, at 19.[5] A defense expert and clinical psychologist also testified that he diagnosed Johnson with latent schizophrenia, polysubstance abuse, attention deficit disorder, and explosive personality disorder, among other conditions. *See* Tr. of Sent. Hr'g, Sept. 2-5, 1997, vol. VI at 636. The psychologist then concluded that, in his opinion, Johnson's anger and hostility emanated "directly from a horrendous family and developmental background." *Id.* at 639.

The defense also presented some positive mitigation evidence. For example, a detective with the Kentucky State Police recounted that Johnson had once entered a building in order to extinguish a fire. *See id.* at vol. V at 597-99. The defense also elicited evidence that, after

---

[5] This transcript is located at R. 15, CD #2, Box 7, in a PDF labeled "2011-SC-137_Johnson_Donald_96-CR-47_Patrial [sic] Transcript of Penalty Phase 9- 6- 1997," and the relevant quote is on page 19.

Johnson committed the crimes in question, he adjusted so well to his subsequent incarceration that a county jailer described him as a "model inmate." *Id.* at vol. III at 318. This is just some of the mitigating evidence that the defense introduced during the multi-day sentencing hearing.

At the conclusion of the penalty phase, the trial judge began by indicating that his forthcoming sentence was the "result of a review of the entire record in this case, including the file, arguments of counsel, and all the evidence." Tr. of Sent. Hr'g, Sept. 6, 1997, at 56. The trial judge recognized that the prosecution had presented evidence that Johnson committed murder during the course of first-degree robbery and first-degree burglary, two state statutory aggravating circumstances. *See id.* at 57. The trial judge then reviewed and discussed the defense's mitigating evidence, including but not limited to the fact that Johnson had no significant prior criminal history, suffered from multiple mental and emotional disorders, was relatively young when he committed his crimes, was abused as a child, and had failed educational opportunities. *See id.* at 57-59. The trial judge then reaffirmed that he had "considered the evidence in its entirety, including evidence offered in aggravation and in mitigation of penalty," found that the prosecution had established the existence of the two aggravating circumstances beyond a reasonable doubt, and sentenced Johnson to death on the murder charge. *Id.* at 59-60.

The trial judge later explained his sentence, saying:

> As to the Capital Murder charge, I do not take this lightly, Mr. Johnson. I gave a great deal of consideration when I reviewed the evidence, the trial testimony, your arguments of counsel, your past social history, and I don't think there's any doubt that you suffered from a bad upbringing. I don't think anyone has disputed that. There was evidence presented on your behalf by Dr. Engum that he diagnosed you with Latent Schizophrenia, Substance Abuse, Attention Deficit Disorder, Development Disorder, Explosive Personality Disorder.

9

While I was reflecting on the evidence that had been presented, it came to me that you told me what to do in your own testimony. You testified that when you asked her to—Ms. Madden to make another telephone conversation, she said, "Are you crazy? You have to go." Now, in relating that to what you've been diagnosed as having Explosive Personality, you next said, and I quote you, "She wasn't mad or nothing. She talked like my mom." Based upon your own testimony, your mother is the only one that ever gave you any affection. You next testified, "I guess I just lost it."

What you did up to the time that you committed this act was that you went to get some polish—something to polish your knife with. You then did this act. You took time to clean yourself up after you got the money. You then went and had cheeseburgers and fries. You then ordered another cheeseburger to go. You then hired a cab to drive you and counted your money as you went. You gave him a right substantial tip when you got there. The next day, you went and got your buddy and went to party; bought marijuana, bought hats, bought scarfs, had a great time.

There's a lot of evidence that you had heard voices in your past, that you hallucinated, those types of things. I heard no evidence whatsoever that at the time you committed this act that you heard any voices or that you hallucinated. You said, "I just lost it. I got mad."

It's now come the norm in these types of cases to blame everybody but yourself. You blame your dad. If you'd a killed your dad, I might have understood that. You blame your siblings. You blame your mother. You blame all the teachers that you've ever had. You blame all the probation officers that you've ever had. You blame everybody. God help us as a society if it gets to the point that you can blame everybody else and justify not facing the maximum penalty for committing an act like you did.

I readily understand why Counsel chose not to take this to a jury initially. The brutality of your act is not a statutory aggravator. And I thought long and hard about that because it is not a statutory aggravator. But, you did in fact brutalize this woman. That in and of itself, I don't think leads to the death penalty; but, your other actions result in no other finding that I could possibly make. You killed this lady for no reason other than she told you you could not use the telephone. No one deserves to die for that reason.

Tr. of Sent. Hr'g, Sept. 30, 1997, at 12-15.[6]  The trial court then formally sentenced Johnson to the death penalty on the murder charge and terms of imprisonment on the remaining charges. *See id.*; *see also* Tr. of Sent. Hr'g, Sept. 6, 1997, at 60-62.

### E.  Direct Appeal to the Kentucky Supreme Court

Johnson then filed a direct appeal with the Kentucky Supreme Court.  *See* R. 36-2 at 6-254.  Johnson asserted over two dozen "assignments of error" on appeal.  *See id.* at 7.  Among Johnson's many claims, he argued that the trial judge violated his constitutional rights by failing to hold a formal competency hearing before accepting his guilty plea.  *See id.* at 78-87.

In June of 2001, the Kentucky Supreme Court entered an Opinion and Order pointing out that, "[a]t the hearing in which the trial court accepted Johnson's guilty plea, defense counsel conceded the issue of his competency."  *Id.* at 347.  The Kentucky Supreme Court also noted that, "[i]n accepting the guilty plea, the trial court relied on defense counsel's stated belief that Johnson was competent as well as a review of the psychological reports [in the record] indicating that [Johnson] was competent."  *Id.*  Still, the Kentucky Supreme Court recognized that "no formal competency hearing was ever conducted," and it determined that the trial court's failure to hold such a hearing ran afoul of state law and "violated Johnson's right to due process."  *Id.* at 347-48.  As a result, the Kentucky Supreme Court remanded Johnson's case to the trial court to determine whether a retrospective competency hearing was permissible, and, if so, to conduct such hearing.  *See id.* at 348-51.

---

[6] This transcript is located at R. 15, CD #2, Box 5, in a PDF labeled "2011-SC-137_Johnson_ Donald_96-CR-47_Transcript of Hearing of 9-30-1997," and the relevant quote can be found on pages 12-15.

*F.  Trial Court's Subsequent Hearings*

On July 2, 2001, the trial court held a hearing to determine whether a retrospective competency hearing would be permissible.  *See* Tr. of Hr'g, July 2, 2001.[7]  After hearing extensive arguments from the attorneys for both parties, the trial court found that it would be possible to conduct such a hearing. *See id.* at 47.  The trial court explained its reasoning, saying:

> This Judge presided over that event where the defendant pled guilty.  This Judge did observe that defendant during that time, observe his interaction with his attorneys, not completely, but at least in open Court.  There wasn't a sufficient lapse of time between this retrospective hearing and the trial in this case.  The Supreme Court has spoken as seven years not being a too lengthy period of time.  There is a transcript of the relative proceedings which have been referred to by both counsel today, at least their interpretations of what the record revealed.  There are mental examinations that were conducted close in time.

*Id*.  The trial court also recognized "[t]he availability of recollections of non-experts, including counsel and the Trial Judge's," before concluding "that the quantity and quality of the available evidence is sufficient for the Court to conduct it's retrospective hearing and reach a decision as to Mr. Johnson's competency at the time of the entry of his plea." *Id.* at 48.

Having determined that a retrospective competency hearing was indeed permissible, the trial court then held that hearing.  *See* Tr. of Hr'g, Aug. 29-30, 2001.[8]  Multiple witnesses testified at the hearing.  For example, Dr. Deland of the KCPC testified to his knowledge in June of 1994. *See id.* at vol. II at 236-39.  Dr. Deland indicated that he was aware Johnson was intending to plead guilty and evaluated Johnson in order to update his competency status

---

[7] This transcript is located at R. 15, CD #2, Box 7, in a PDF labeled "2011-SC-137_Johnson_ Donald_96-CR-47_Hearing Conducted July 2 2001."

[8] This transcript is located at R. 15, CD #2, Box 5, and it consists of three separate PDFs/volumes. The first PDF is labeled "2011-SC-137_Johnson_Donald_96-CR-47_Transcript of Hearing of 8-29 and 8-30-2001 Vol I of III," and the other PDFs are labeled "Vol II of III" and "Vol III of III."

12

ahead of that change in his plea.  *See id.* at vol. II at 238.  Given those circumstances, Dr. Deland testified that he was thorough and in fact "left no stone unturned" in examining Johnson's understanding of "the court process."  *Id.*  Dr. Deland testified that Johnson "had much more than just a rote understanding of what was going on" and actually had "a very deep understanding of" the issues involved.  *Id.* at vol. II at 239.  Dr. Deland also testified that he "never got an indication" from Johnson's trial attorneys that "they had concerns about his abilities to understand things in a substantial way."  *Id.* at vol. II at 253.  Dr. Deland testified that, in his opinion, Johnson was competent to stand trial, and he had issued his written report to that effect just three days before Johnson pled guilty.  *See id.* at vol. II at 236-39.

Dr. Berland, the psychologist who had previously been hired by the defense team, also testified at the retrospective competency hearing.  *See id.* at vols. I and II.  On both direct and cross-examination, Dr. Berland acknowledged that he had not been able to conclude that Johnson was incompetent when he spoke with him prior to pleading guilty.  *See id.* at vol. I at 88, 135.  Other evidence was also introduced at the retrospective competency hearing.  *See id.* at vols. I, II, and III.  Ultimately, at the end of the multi-day evidentiary hearing, the trial court concluded that Johnson had been competent to enter his guilty plea in June of 1994.  *See id.* at vol. II at 282-83.

### G.  *Proceeding with the Direct Appeal to the Kentucky Supreme Court*

Following the trial judge's retrospective finding of competency, Johnson went forward on his direct appeal to the Kentucky Supreme Court.  Johnson reasserted his numerous claims of error, and he also filed a supplemental brief regarding the retrospective competency issue.

*See* R. 36-2 at 6-254, 353-407.   While the Kentucky Supreme Court reviewed each of Johnson's arguments, it ultimately rejected his claims.  *See Johnson*, 103 S.W.3d at 687.

Johnson first argued that his guilty plea was not entered knowingly, voluntarily, and intelligently.  *See* R. 36-2 at 37-53.  That is because the trial court did not specifically inform Johnson of certain rights he was waiving, including his right to a trial by jury and his right against self-incrimination.  *See id.*  Johnson claimed that the trial court failed to sufficiently cover these matters during his plea colloquy, in violation of the United States Supreme Court's decision in *Boykin v. Alabama*, 395 U.S. 238 (1969).  *See id.*  Thus, Johnson argued his guilty plea was invalid.  *See id.*

As an initial matter, three justices on the Kentucky Supreme Court agreed with Johnson, stating that "the record here is silent as to whether [he] waived his right to trial by jury or his right against self-incrimination."  *Johnson*, 103 S.W.3d at 700 (Keller, J., dissenting).  Those justices first emphasized that the trial court did not require Johnson to complete a written guilty plea form, and, therefore, "the only evidence in the record as to [Johnson's] waiver of his rights appears in the transcript of the guilty plea colloquy between the trial court and [Johnson]."  *Id.* at 699-700.  The justices then reviewed that plea colloquy and highlighted the fact that the trial court "failed to even mention the words 'self-incrimination' or 'jury.'"  *Id.* at 700.  The justices described this silence as "conspicuous" and concluded that while Johnson's "guilty plea may have been knowing and voluntary . . ., we have no way of knowing from a silent record."  *Id.*  Thus, those justices would have vacated Johnson's guilty plea and remanded the matter back to the trial court.  *See id.*

14

A majority of the justices, however, disagreed with this conclusion and rejected Johnson's claim regarding his guilty plea. *See Johnson*, 103 S.W.3d at 691. To be sure, the Kentucky Supreme Court acknowledged that the trial court did not require Johnson to complete a written guilty plea form. *See id.* at 692. The court also pointed out that Johnson correctly identified his so-called *Boykin*-rights. *See id.* at 691. The court, however, explained that "in the instance of a guilty plea, *Boykin v. Alabama* does not require a separate enumeration of rights waived and separate waivers as to each. Rather, *Boykin* requires that the defendant have a full understanding of what the plea connotes and its consequences." *Id.* (citations and quotation marks omitted). The court then recognized that, "[i]n this case, prior to accepting the guilty pleas, the trial court asked [Johnson] twenty questions pertaining to his understanding of his legal circumstances and consequences." *Id.* The court ultimately determined that these questions and Johnson's responses left "no doubt that he was aware of the rights he was waiving," and, as a result, "there was no error." *Id.*

Johnson next argued that his "death sentence must be vacated because there was no valid waiver of jury sentencing." R. 36-2 at 54. The Kentucky Supreme Court, however, rejected Johnson's argument, explaining that his position ran counter to his earlier insistence that "he had a right to waive jury sentencing." *See Johnson*, 103 S.W.3d at 690. Indeed, the court emphasized the fact that Johnson had "vigorously continued to pursue sentencing by the trial court instead of a jury throughout appellate litigation," including during his opposition to the Commonwealth's earlier interlocutory appeal. *Id.* at 691-92. The court explained that it was "clear that [Johnson's] unswerving trial strategy involved adamant avoidance of a jury trial and a jury sentencing recommendation." *Id.* at 692. The court then said, "Given the

excessively gruesome nature of the murder, which entailed torture and mutilation of an elderly victim, this strategy was not unreasonable. The abhorrent details of this murder would not have invited sympathy from a jury." *Id.* The court therefore concluded that Johnson's "current claims of error with regard to the lack of a jury trial, after he assiduously evaded a jury trial, do not warrant reversal." *Id.*

Johnson also argued that the trial judge failed to consider all of the mitigating evidence he offered during the penalty phase. *See* R. 36-2 at 135-42. In fact, Johnson claimed that "[r]ather than considering all mitigating evidence presented," the trial court based its sentence on other, improper considerations, as demonstrated by its comments at the sentencing hearing. *See id.* at 140. Among other things, Johnson objected to the trial court's statement that he "blame[d] everybody" for his actions before adding, "God help us as a society if it gets to the point that you can blame everybody else and justify not facing the maximum penalty for committing an act like you did." *Id.* at 135-36. Johnson also objected to other statements made by the trial court. *See id.* at 140.

The Kentucky Supreme Court, however, rejected Johnson's argument outright. *See Johnson*, 103 S.W.3d at 697. Having reviewed the underlying record, the court stated plainly that there was no merit to Johnson's claim that the trial court's comments at the sentencing hearing somehow prevented his mitigating evidence from being considered. *See id.* Thus, the court denied Johnson's claim. *Id.*

Johnson further argued that the trial court violated his due process rights when it permitted a retrospective competency hearing. *See* R. 36-2 at 354-55 and 356-58. The Kentucky Supreme Court, however, rejected Johnson's claim. *See Johnson*, 103 S.W.3d at

16

693.  The court began by citing its recent decision in *Thompson v. Commonwealth*, 56 S.W.3d 406, 408-10 (Ky. 2001), in which it concluded that retrospective competency hearings were a permissible remedy for a trial court's initial failure to hold a competency hearing.  *See Johnson*, 103 S.W.3d at 693.  The court explained that, as a general matter, a retrospective competency hearing will satisfy due process requirements "provided it is based upon evidence related to observations made or knowledge possessed at the time of trial" and so long as "[t]he quantity and quality of available evidence [is] adequate to arrive at an assessment that could be labeled as more than mere speculation."  *Id.* (citations and quotation marks omitted).  The court then elaborated:

> Some factors bearing upon the permissibility of a retrospective competency hearing are:  1) the length of time between the retrospective hearing and the trial, 2) the availability of transcript or video record of the relevant proceedings, 3) the existence of mental examinations conducted close in time to the trial date, and 4) the availability of the recollections of non-experts—including counsel and the trial judge—who had the ability to observe and interact with the defendant during trial.  No single factor is determinative, and the issue should be decided on a case-by-case basis.

*Id.* (citations omitted).

The Kentucky Supreme Court then reviewed the underlying record and recognized that the trial court had considered the foregoing factors.  *See id.*  The court explained that the trial judge noted "as significant the availability of the trial court's personal observations of [Johnson] prior to and during the entry of the plea, including [his] interaction with trial counsel; the availability of psychological reports and trial counsel's opinion as to competency; and the availability of a transcript of the relevant proceedings."  *Id.*  The court also noted that the trial judge "considered it significant that there were mental examinations performed close in time

17

to the entry of the plea." *Id.* Finally, the court pointed out, with respect "to the time lapse between the plea entry and the competency hearing," the trial judge referred to a previous Kentucky Supreme Court opinion indicating "that seven years between the trial and the retrospective hearing was not enough in and of itself to deny . . . due process." *Id.* Given the trial judge's consideration of the relevant factors, the Kentucky Supreme Court concluded that "there was sufficient evidence to sustain the trial court's view that a retrospective hearing was adequate." *Id.* Thus, the court held that "there was no error." *Id.*

Johnson additionally argued that "[t]he examinations and evaluations of [him] were insufficient to make a reliable determination of his competency." R. 36-2 at 358; *see also id.* at 358-64. The Kentucky Supreme Court, however, also rejected that claim. *See Johnson*, 103 S.W.3d at 694. The court explained its reasoning, saying:

> . . . KCPC psychiatrist Frank Deland testified at the August 29–30, 2001 hearing to his knowledge at the time just prior to entry of the guilty plea. Dr. Deland stated that based upon his discussions with [Johnson's] trial attorneys, he had been aware that [Johnson] was going to enter an open-ended plea. Dr. Deland testified that the report issued three days before the plea was based upon an evaluation conducted specifically to update [Johnson's] competency status in light of the impending plea. Given the significance of the plea, according to Dr. Deland's testimony, he had wanted to be very thorough regarding [Johnson's] understanding of the court process. Dr. Deland testified that he had concluded that Appellant had "much more than a rote understanding of what was going on," and in fact had "a very deep understanding of these issues."
>
> Dr. Deland further testified that he had received no indication from [Johnson's] two trial attorneys that they were concerned about [Johnson's] competency. DPA psychologist Dr. Berland admitted on both direct and cross-examination that he had not been able to conclude that [Johnson] was incompetent when he spoke to him prior to the guilty plea.

18

*Id.* In light of the foregoing, the Kentucky Supreme Court concluded that "there was sufficient evidence for a retrospective finding of competency," despite Johnson's claim to the contrary. *Id.*

Johnson also asserted several other claims on direct appeal, including but not limited to arguing that the prosecution failed to establish a factual basis to support his guilty plea and the trial court erred by failing to suppress certain evidence showing the crime scene. *See* R. 36-2 at 60-66, 104-11. The Kentucky Supreme Court, however, rejected each of Johnson's claims in its comprehensive opinion and ultimately affirmed the trial court's judgment. *See Johnson*, 103 S.W.3d at 690-98. The United States Supreme Court then denied Johnson's petition for a writ of certiorari. *See Johnson v. Kentucky*, 540 U.S. 986, 124 S. Ct. 470 (Nov. 3, 2003).

### H. State Post-Conviction Motion

Johnson then filed multiple post-conviction motions, including a motion to vacate his convictions and sentence pursuant to Rule 11.42 of the Kentucky Rules of Criminal Procedure. *See* Johnson's Mot. to Vacate Under RCr. 11.42, Mar. 4, 2004.[9] Johnson raised numerous issues in that motion. *See id.* Johnson again argued that he was incompetent at the time he pled guilty. *See id.* at 12-15. Johnson then claimed that his attorneys provided ineffective assistance of counsel in multiple respects, including by failing to work properly with experts

---

[9] This motion is located at R. 15, CD #2, Box 7 in a PDF labeled "2011-SC-137_Johnson_Donald_96-CR-47_Vol I of III July 27 2006." While the motion begins on PDF page 86, it is numbered pages 1-48. This opinion cites the latter page numbers.

to establish his incompetency and insanity defense, at various points throughout the penalty phase, and by not withdrawing his guilty plea. *See id.* at 16-26, 33-44.

Johnson also claimed for the first time that his guilty plea should be set aside as involuntary because he was under the belief that the trial judge had agreed to sentence him to life without parole (LWOP) for 25 years. *See id.* at 28-29. On this point, Johnson alleged that the trial judge had improper ex parte contact with him and his defense team and asked him whether he would accept a sentence of "life without parole for twenty-five years," to which he replied "yes." *Id.* at 29. Johnson further alleged that, as a result of this exchange, his defense team believed there was a "firm commitment" to such a sentence if Johnson entered a guilty plea, which he subsequently did. *Id.* Johnson filed multiple exhibits in support his allegations, including but not limited to his own sworn statement and an affidavit from Kelly Gleason, one of his attorneys at the time he pled guilty. *See* Johnson Aff., Mar. 3, 2004; Gleason Aff., Mar. 1, 2004.[10]

The trial court, however, entered an order on April 5, 2006, rejecting Johnson's claims and doing so without holding an evidentiary hearing. *See* R. 36-2 at 522-38. The trial court appeared to summarily reject Johnson's arguments regarding his mental health and ineffective assistance of counsel claims. *See id.* at 534-37. The trial court also separately rejected Johnson's allegation that it promised not to impose the death penalty, saying that it was

---

[10] These affidavits, which were filed in support of Johnson's state post-conviction motion, are also located at R. 15, CD #2, in Box 7. Like Johnson's motion, his affidavit can be found in the PDF labeled "2011-SC-137_Johnson_Donald_96-CR-47_Vol I of III July 27 2006," and it is located on PDF pages 135-46. Gleason's affidavit, on the other hand, can be found on a separate PDF labeled "2011-SC-137_Johnson_Donald_96-CR-47_Vol II of III July 27 2006," and it is located on PDF pages 48-53.

"emphatic in its position that no promise was ever made to the defendant and the record clearly show[s] that there was no promise made." *Id.* at 533-34. Thus, the trial court denied Johnson's requests for relief. *See id.* at 537.

### I. Post-Conviction Appeal to the Kentucky Supreme Court

Johnson appealed the trial court's denial of his requests for post-conviction relief. *See* R. 36-2 at 464-538. He again raised numerous claims of error related to the validity of his guilty plea and the trial court's sentence. *See id.* The Kentucky Supreme Court ultimately rejected each of Johnson's claims, except for one. *See Johnson v. Commonwealth*, No. 2006-SC-00058-MR, 2008 WL 4270731 (Ky. Sept. 18, 2008).

As an initial matter, Johnson argued he was incompetent when he pled guilty. *See* R. 36-2 at 497-500. Johnson acknowledged that he previously litigated this issue on direct appeal but claimed he had "new evidence" of his incompetence at the time of his guilty plea. *See id.* Specifically, Johnson alleged that Dr. Berland, the defense psychologist who initially evaluated him in 1994, was only able to complete his evaluation recently, after Johnson was placed on a specific anti-psychotic medication known as Trilafon. *See id.*

The Kentucky Supreme Court, however, rejected Johnson's claim. *See Johnson*, 2008 WL 4270731, at *6. The court determined that Johnson was simply trying to "relitigate an issue already decided in the retrospective competency hearing." *Id.* The court also added that "Dr. Berland's inability to conclude his evaluation in 1994 was taken into consideration in the retrospective competency hearing as part of his opinion as to Johnson's competence." *Id.* Thus, the court denied Johnson's competency argument. *See id.*

21

Johnson also alleged that his attorneys were constitutionally ineffective in multiple respects. *See* R. 36-2 at 495-97, 500-511. That said, the Kentucky Supreme Court reviewed Johnson's allegations, repeatedly discussed the relevant legal standards for ineffective assistance of counsel claims, and determined that each of Johnson's claims lacked merit. *See Johnson*, 2008 WL 4270731, at *4-6 (citing *Strickland v. Washington*, 466 U.S. 668 (1984), as well as other ineffective assistance of counsel cases).

Among other things, Johnson argued that that his attorneys were ineffective for failing to work with experts to establish a defense based on incompetence and insanity. *See* R. 36-2 at 500. The Kentucky Supreme Court, however, rejected Johnson's claim, saying that its "review of the record shows that defense attorneys employed a defense expert to develop a defense based on incompetence or insanity, but the trial court was persuaded by the opinion of the . . . KCPC psychiatrist that Johnson was not incompetent." *Johnson*, 2008 WL 4270731, at *4. While Johnson continued to claim that his attorneys failed to "follow through on [Dr. Berland's] medication recommendations," R. 36-2 at 501, the Kentucky Supreme Court said it found "no basis for Johnson's assertion that counsel 'abandoned' the effort to develop a defense because they did not uncover any incompetence and did not ensure that [Johnson] was medicated with the antipsychotic drug suggested by Dr. Berland." *Johnson*, 2008 WL 4270731, at *4. The court also noted that Johnson was taken to KCPC for treatment and evaluation and stated that "it was not the job of the attorneys to say what his treatment or medication should be." *Id.* The court then emphasized that, in the end, "none of the experts, including the defense psychologist, expressed an opinion that Johnson was incompetent at the

22

time that he pled guilty." *Id.*   Thus, the court determined that Johnson failed to establish ineffective assistance. *Id.*

The Kentucky Supreme Court also distinguished *Wiggins v. Smith*, 539 U.S. 510 (2003), a United States Supreme Court case upon which Johnson relied. *See Johnson*, 2008 WL 4270731, at *5. The court explained that the attorneys in *Wiggins* "did no exploration of the history of the defendant, despite funds having been allotted for that use, and presented none of his background to the court in mitigation." *Id.* (citing *Wiggins*, 539 U.S. at 510). In Johnson's case, however, the court said that his "attorneys fulfilled their obligation to investigate his background and have his mental state investigated. In fact, the doctor for KCPC recalled in the retrospective competency hearing that counsel shared with him a thorough background investigation consisting of about fifteen pages of notes." *Johnson*, 2008 WL 4270731, at *5. Given these facts, the court concluded that Johnson could not show that his attorneys' performance was deficient, let alone that their performance prejudiced his defense, as required to establish an ineffective assistance of counsel claim. *See id.* (citing *Strickland*, 466 U.S. at 687).

Johnson then argued that his attorneys were ineffective in not putting on additional evidence at the penalty phase, and he alleged four errors in this regard. *See* R. 36-2 at 505-11. First, Johnson blamed his trial counsel for failing to call a psychiatrist named Dr. Strobel as a witness during the penalty phase. *See id.* at 480-85, 505-06. According to Johnson, Dr. Strobel saw Johnson in Texas in 1987 and diagnosed him "as a paranoid schizophrenic." *Id.* at 480-81. Johnson acknowledged that related hospital records were admitted into evidence during

23

the penalty phase, but he nevertheless argued that his attorneys were ineffective for not actually calling Dr. Strobel as a witness. *See id.* at 505-06.

The Kentucky Supreme Court, however, rejected Johnson's argument. *See Johnson*, 2008 WL 4270731, at *5. The court pointed out that "a review of the sentencing hearing shows that defense counsel was aware of the contents of" the medical records at issue, "having placed them in the trial record and having questioned witnesses about them." *Id.* The court also noted that "the medical professionals who testified at the retrospective competency hearing were aware of the hospital records and took the diagnosis into consideration." *Id.* Indeed, the court explained:

> Dr. Deland from KCPC testified that he had looked at the documents from 1987 and said it might very well be true that Johnson experienced hallucinations and had a "psychotic break" at that time; but he did not think [Johnson] was experiencing true hallucinations when he examined [Johnson]. Thus, according to Dr. Deland, it was not determinative of the diagnosis in 1994 to know whether [Johnson] had had a psychotic break or experienced hallucinations in 1987. Dr. Strobel would not have been able to shed any more light on [Johnson's] mind set years after the diagnosis than those doctors who examined him for trial.

*Id.* Thus, the Kentucky Supreme Court concluded that the failure to call Dr. Strobel as a witness did not amount to ineffective assistance. *See id.*

Second, Johnson argued that his attorneys "failed to obtain readily available evidence of an extensive history of mental illness in [his] family" and claimed that "[t]his was deficient performance." R. 36-2 at 506. The Kentucky Supreme Court, however, rejected Johnson's claim. *See Johnson*, 2008 WL 4270731, at *6. The court first noted that it did "not agree that this would clearly be an indication of attorney ineffectiveness given counsel's investigation into the crucial question of Johnson's own possible mental illness." *Id.* The court then

24

explained that Johnson's claim must fail in any event "because the depositions in the record demonstrate that [his] counsel inquired into mental illness in Johnson's family." *Id.*

Third, Johnson argued that his counsel erred by failing to counter certain "damaging" testimony by Dr. Deland during the penalty phase. *See* R. 36-2 at 508. According to Johnson, Dr. Deland suggested that he did not truly have auditory hallucinations and did not hear voices; instead, Dr. Deland indicated that Johnson was misinterpreting the normal internal voice that exists within most people. *See id.* Johnson argued that his attorneys should have impeached Dr. Deland's testimony with testimony from their own witness, Dr. Engum. *See id.* at 508-10.

The Kentucky Supreme Court, however, rejected Johnson's argument. *See Johnson*, 2008 WL 4270731, at *6. The court pointed out that Johnson's counsel had thoroughly investigated the issue of mental illness and already presented evidence from their experts that Johnson displayed latent schizophrenia. *See id.* Thus, the court determined that Johnson had not shown that there was some defense that his attorneys did not investigate or present, as required to make out an ineffective assistance claim. *See id.*

Fourth, Johnson argued that his attorneys' failure to introduce evidence of so-called "overkill" amounted to a constitutional violation. *See* R. 36-2 at 510. In other words, Johnson suggested that an expert could have testified that the extremely lengthy and violent nature of the murder "was further evidence of [his] psychotic state," something that "would have been helpful to the judge, or any other fact-finder, to hear." *Id.* at 510-11.

The Kentucky Supreme Court, however, held that this did not amount to ineffective assistance. *See Johnson*, 2008 WL 4270731, at *6. Instead, the court determined that Johnson's argument amounted to nothing more than mere speculation that the "subject matter

25

would have made a difference to the judge's sentencing decision." *Id.* Thus, the court found no constitutional violation here or during Johnson's penalty phase more broadly. *See id.*

Johnson also argued that his trial counsel was constitutionally ineffective for not trying to withdraw his guilty plea on the basis that he had an agreement with the trial judge regarding his sentence. *See* R. 36-2 at 495-97. The Kentucky Supreme Court, however, rejected this ineffectiveness claim. *See Johnson*, 2008 WL 4270731, at *4. The court pointed out that "withdrawal of a plea is not automatic" and "permission to withdraw is within the sound discretion of the trial court." *Id.* The court also noted that "[c]ounsel was aware that an earlier effort to withdraw the guilty plea had not succeeded." *Id.* The court ultimately indicated that it saw "no evidence of attorney ineffectiveness for failure to withdraw." *Id.*

That said, the Kentucky Supreme Court did express concern about whether there had been judicial interference in the plea process. *See Johnson*, 2008 WL 4270731, at *1. Johnson once again suggested that his guilty plea should be set aside as involuntary because he pled under the belief that the trial judge had agreed to sentence him to life without parole for 25 years. *See* R. 36-2 at 488-95. On this issue, the Kentucky Supreme Court held "that the trial court erred when it failed to conduct an evidentiary hearing on the merits of Johnson's claim because material issues of fact exist that cannot be proved or disproved upon the face of the record." *Johnson*, 2008 WL 4270731, at *1. The court also noted that "Johnson raise[d] a question about whether he was coerced when his counsel allegedly threatened to withdraw from the case, which is not resolved upon this record." *Id.* at *3. Therefore, the court remanded Johnson's case for an evidentiary hearing on these matters, and it ordered that Judge Caudill, the trial court judge, be disqualified from presiding because he would "necessarily be a witness

26

in the evidentiary hearing." *Id.* at *1; *see also id.* at *4.  In Judge Caudill's place, the court directed that a "special judge . . . hear the . . . 11.42 motion as it pertains to the issue of the voluntariness of the guilty plea," the only matter still pending.  *Id.* at *4.

## J.  Post-Conviction Evidentiary Hearing in the Trial Court

On remand, special judge Eddy Coleman was assigned to the case, and he held an exhaustive, multi-day evidentiary hearing over a number of months to consider whether there was improper judicial interference in the plea process and whether Johnson's lawyers coerced him by threatening to withdraw if he refused to plead guilty.  *See* Post-Conviction Evid. Hr'g, Apr.–June, 2010.[11]  The hearing lasted many hours and examined precisely what had transpired in the time leading up to Johnson's guilty plea.  *See id.*  Fourteen witnesses testified at the hearing, including but not limited to Johnson himself, several members of his defense team (including leading counsel Mike Williams and second chair Kelly Gleason), Judge Caudill,

---

[11] Some of the videos from the post-conviction evidentiary hearing are located at R. 15.  Those videos are contained on three separate CDs, they are each labeled on top as "2011-SC-137 *Commonwealth of KY v. Donald Johnson*," and they are respectively dated "4-12-10," "5-20-10," and "6-10-10."  That said, the parties in this habeas action agreed that Donald Johnson was the first witness to testify at the post-conviction evidentiary hearing on the morning of April 12, 2010. However, the CD at R. 15 that is dated 4-12-10 does *not* contain a video of Johnson's testimony. As a result, this Court ordered the Respondent to file a new CD into the record containing that video of Johnson's testimony.  *See* R. 41.  The Respondent subsequently filed that CD into the record, and it is located at R. 47.  That CD is also labeled "2011-SC-137 *Commonwealth of KY v. Donald Johnson,*" and it is likewise dated "4-12-10."

and members of the judge's staff.[12]  *See id.*  Judge Coleman also admitted numerous exhibits into the record.[13]  *See id.*

After hearing all of the testimony, Judge Coleman entered findings of fact and conclusions of law.  *See* R. 36-2 at 636-43.  He analyzed the testimony of the various witnesses and explained why he did or did not believe them.  *See id.* at 638-42.  In doing so, he found the testimony of Mike Williams and Judge Caudill convincing.  *See id.* at 638-40.  Ultimately, with respect to the question of judicial interference in the plea process, Judge Coleman found that there had been no "secret deal" reached; indeed, he concluded that Johnson "was not promised a life sentence in exchange for a guilty plea by the trial judge or anyone else" and that there was "no credible evidence to find otherwise."  *Id.* at 637.  And with respect to whether Johnson's lawyers coerced him by threatening to withdraw, Judge Coleman concluded "that trial counsel did not threaten to withdraw if [Johnson] refused to plead guilty."  *Id.* at 640.  Thus, Judge Coleman denied Johnson's request for post-conviction relief.  *See id.* at 643.

---

[12] On April 12, 2010, nine witnesses testified:  (1) Johnson himself; (2) defense attorney Vincent Yustas; (3) defense attorney William Spicer; (4) prosecutor John Swain; (5) Judge Caudill's court reporter Debra Stanley; (6) Judge Caudill's law clerk JoAnne Harvey; (7) defense attorney George Sornberger; (8) Judge Caudill; and (9) Mike Williams.  On May 20, 2010, four more witnesses testified:  (1) Jeff Carter, a Department of Public Advocacy employee; (2) Fortune Royce, a computer technician with the Department of Public Advocacy; (3) Kelly Gleason; and (4) attorney Gary Johnson.  On June 10, 2010, defense mitigation specialist Chris Brown testified, and Mike Williams testified for a second time.

[13] The Respondent in this habeas action did not initially file those exhibits into the present record.  However, this Court ordered the Respondent to ensure that the record contained "any and all relevant evidence/exhibits admitted at the state post-conviction evidentiary hearing" and was "otherwise complete."  R. 45 at 2.  In response to that Order, the Respondent filed a copy of the numerous exhibits that were introduced at the post-conviction hearing.  Most of the exhibits are located at R. 46-1 (labeled Exhibits 1 through 17), though the Respondent filed three of the exhibits (Exhibits 7, 8, and 10) conventionally at R. 47.

### K.  Second Post-Conviction Appeal to the Kentucky Supreme Court

Johnson appealed his case once more to the Kentucky Supreme Court and again argued that his guilty plea was coerced in two ways.  *See* R. 36-2 at 594-644.  Johnson first claimed "that his guilty plea was induced by a secret deal (or his belief in the existence of a secret deal) in which the trial judge indicated that he would not sentence Johnson to death if he entered a guilty plea."  *Johnson*, 412 S.W.3d at 158 (discussing Johnson's arguments on appeal).  Johnson also argued "that his plea was coerced by his lawyer's threat to withdraw from the representation if Johnson did not enter a guilty plea."  *Id.*

The Kentucky Supreme Court affirmed the trial court's decision rejecting Johnson's claims.  *See id.* at 158-70.  Justice Mary Noble wrote for a unanimous Kentucky Supreme Court and began by summarizing, in extensive detail, the testimony of the various witnesses at the multi-day evidentiary hearing.  *See id.* at 160-64.  This included a discussion of Johnson's own statements, as well as the testimony of Kelly Gleason, the second chair on Johnson's defense team.  *See id.* at 160-61.  The court noted that Johnson "testified that he believed some sort of deal had been reached" because "at one point, while only his lawyers and a bailiff were present with him, the judge approached him and asked whether he would take LWOP 25, to which he said yes."  *Id.* at 160 (discussing Johnson's testimony at length).  The court also discussed how Gleason likewise testified that, on one occasion at the Floyd County Courthouse annex, "she, Johnson, Williams and a bailiff were waiting for the county attorney to arrive" when Judge Caudill "asked if Johnson would take LWOP 25, to which Johnson said yes."  *Id.* at 161.  The court noted that Gleason "interpreted this as the judge assuring them he would not give Johnson death."  *Id.*  The Court also mentioned that Gleason

29

"claimed that Williams yelled at Johnson and threatened to quit if he insisted on going to trial, which led Johnson to enter the guilty plea." *Id.*

The court then summarized the testimony of several other witnesses, including Mike Williams and Judge Caudill. *See id.* at 161-64. Indeed, the court noted that Williams "testified that there was no deal and that he had no assurances from the judge." *Id.* at 163. The Court also discussed Williams's testimony that, at the courthouse annex, "the judge said, 'If you could get . . . LWOP 25, would you take that?' to which Johnson said, 'Well, yeah.'" *Id.* The court added that Williams "testified that he did not tell Johnson that this conversation meant the judge would not impose death if he entered a blind plea, and that instead he thought it was simply the judge seeing if the parties were close to reaching a deal, that is, a plea bargain." *Id.* The court also pointed out that Williams "denied having threatened Johnson to force him to enter a guilty plea." *Id.* The court then discussed how Judge Caudill "testified that there was no 'deal' and that he had no memory of asking Johnson if he would take LWOP 25." *Id.* at 164. The court also mentioned how Judge Caudill suggested that he may have merely "inquired about the possibility of settlement, and that Williams may have said to him at some point that Johnson was interested in such a deal and that he (the judge) might have then asked, 'Would you take it if the Commonwealth offered it to you?'" *Id.*

The foregoing was just a fraction of the statements the court discussed in its opinion. *See id.* at 160-64. In fact, the court summarized the testimony of the numerous witnesses in great detail over the course of two dozen paragraphs. *See id.* The court also discussed the relevant documentary evidence admitted into the record. *See id.* For example, the court thoroughly described an office memorandum allegedly written by Mike Williams to Kelly

Gleason in which he made a variety of statements about his interactions with his clients, as well as certain entries in a so-called "trial diary." *See id.* at 161-62. In short, the court methodically discussed the relevant testimonial and documentary evidence from the hearing before recognizing that the trial judge had denied Johnson's request for post-conviction relief. *See id.* at 164.

The Kentucky Supreme Court then began its analysis by discussing the United States Supreme Court's decision in *Machibroda v. United States*, 368 U.S. 487 (1962). *See Johnson*, 412 S.W.3d at 164-65. The court recognized that, consistent with *Machibroda*, the conduct of a trial judge can render a guilty plea involuntary, such as when the judge becomes too deeply involved in plea negotiations and misleads the parties. *See id.* (discussing *Machibroda* and its progeny). The court also noted that the conduct of defense counsel can also make a plea involuntary. *See id.*

Still, the court pointed out that Judge Coleman had thoroughly considered and rejected Johnson's claims. *See id.* at 165-66. The court explained:

> Judge Coleman found that Judge Caudill had not impermissibly injected himself into the case. Specifically, he found that no "secret deal" had been reached and that no credible evidence would suggest otherwise. In making this finding, he discussed the proof, including the competing versions of what happened, and specifically found that the testimony of the original trial judge and Johnson's lead counsel were convincing. He also found that Johnson's counsel had not threatened him. The judge's decision turned on these factual findings.

*Id.*

The Kentucky Supreme Court deferred to these findings. *See id.* at 166. The court explained that Judge Caudill had the opportunity to see the witnesses and observe their demeanor and thus was in a superior position to judge their credibility and the weight to be

31

given to their testimony. *See id.* The court then upheld Judge Caudill's findings. *See id.* at 166-68.

The Kentucky Supreme Court explained its decision at great length. *See id.* at 166-70. Among other things, the court said:

> Johnson essentially argues that the trial court improperly weighed the testimony of various witnesses, chose a complicated take on the facts over a simple one (and thereby failed to apply the principle of Occam's razor), and accepted inconsistent and contradictory testimony (specifically that of Mike Williams). For these reasons, Johnson argues, the trial court's findings were clearly erroneous. This Court cannot agree.

> A large portion of Johnson's brief is dedicated to recounting the minutiae of various witnesses' testimony and pointing out how that testimony contradicted the testimony of witnesses supporting Judge Coleman's findings. But that is simply not a sufficient reason to find clear error. In essence, Johnson claims that because more witnesses testified in his favor, his version of the facts must be true. But resolving the conflict between the competing versions of the facts is a job for the trial court, not an appellate court. The special judge did so in this case and found either that those witnesses were not credible or gave little weight to their testimony.

> . . .

> Ultimately, this Court concludes that there was substantial evidence to support Judge Coleman's findings that there never was a secret deal and that Johnson's lawyer did not coerce him into pleading guilty by convincing him that there was a deal. Judge Caudill's and Mike Williams's testimony support these findings. That Johnson's supporting witnesses outnumbered and contradicted these witnesses does not make their testimony insubstantial. That Judge Coleman stated that some of these witnesses actually supported his findings, when they may in fact have been more supportive of Johnson's claims, does not change the fact that several witnesses did, in fact, testify that there was no deal and that Johnson was never told there was a deal. Thus, this Court cannot say that the findings were clearly erroneous.

> This conclusion is buttressed by the fact that Johnson swore in open court at his guilty plea that he was not promised anything or coerced into pleading guilty. While such sworn statements are not conclusive, they do, as this Court noted in remanding the case for the evidentiary hearing, carry a strong

> presumption of verity. . . .  Those statements alone were insufficient to find that Johnson was not coerced, since they were contradicted by his [post-conviction] motion, but when combined with Judge Coleman's findings, they are convincing that Johnson was not in fact coerced.

*Id.* at 166-68 (citations and quotation marks omitted).

Finally, the Kentucky Supreme Court recognized that "[t]he more difficult issue in this case is whether Johnson may have believed there was a deal, . . . even if no actual deal existed." *Id.* at 168.  The court noted that Johnson had repeatedly argued "that what matters is not whether there actually was a deal but whether Johnson *believed* there was one, based on Judge Caudill's and Mike Williams's statements to him."  *Id.* (emphasis in the original).  The court added:

> In fact, [Johnson] goes so far as to suggest that all the rest of the witnesses, including Judge Caudill (for the most part) were consistent, since the conversation in the annex, whatever form it took, could be read innocently by itself, and that it is only Mike Williams's alleged statements to Johnson and the defense team that would lead Johnson to believe that conversation with the judge meant anything other than his inquiring about the possibility of a settlement.  Thus, Johnson argues, the only witness that would have to be disbelieved to go his way is Mike Williams.  This is where he argues that Occam's razor should come into play and require Judge Coleman to accept the "simple" answer (that Mike Williams was lying) over the complex answer (that many other witnesses were not telling the truth).

*Id.* at 168-69.

The Kentucky Supreme Court, however, rejected Johnson's argument, explaining that "while Occam's razor is a useful guide in many aspects of decision-making, it is not an irrefutable principle of logic or the law, and it never compels a result, stating at best a preference for 'simple' theories and outcomes."  *Id.* at 169.  The court then said:

> . . .  [A]gain, the fact that Johnson has more witnesses to support his claim, and that it might be simpler to disbelieve the testimony of a single witness

33

rather than half a dozen, does not require that his claim be accepted. Such a practice would remove from the trial judge any need to assess the credibility of witnesses or weigh their testimony and instead allow (or even require) the judge to side with whomever has the most witnesses. That is not judging; it is the absence of judgment, requiring only the mechanical weighing of the number of witnesses on each side, and makes a mockery of the scale as a symbol of justice.

. . .

Weighing the proof and judging credibility is the function of the trial judge in such cases. Moreover, this [is] not a case where the judge simply disbelieved the defendant's evidence and based his findings solely on the lack of proof. In this case, there was substantial proof from Mike Williams (as to his interactions with Johnson) to support a conclusion that Johnson did not believe in the existence of a secret deal.

Additionally, this Court cannot say that Judge Coleman's conclusion that Williams did not threaten or otherwise coerce Johnson was clearly erroneous. Like the finding discussed above, there was far more than a scintilla of evidence to support his finding. That is sufficient to require this Court to defer.

*Id.* at 169-70.

In the end, the Kentucky Supreme Court concluded that "the proof simply does not show that [Judge Caudill] interfered with the [plea] process" in a legally impermissible manner. *Id.* at 170. The court also concluded that "the proof supports a finding that Johnson's lawyer did not threaten or otherwise coerce him into pleading guilty." *Id.* Thus, the court affirmed the judgment of the trial court and denied Johnson's request for post-conviction relief. *See id.*

### L.  Federal Habeas Proceedings

Johnson then filed a petition for a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254. *See* R. 1. In that petition, Johnson raises the following eight claims:

1. Don Johnson was denied due process of law when the trial court accepted a guilty plea which was not entered knowingly, voluntarily, and intelligently.

34

2.  Trial Judge failed to consider and give effect to all evidence presented in mitigation of a death sentence in violation of Donald Johnson's rights under the Eighth and Fourteenth Amendments of the United States Constitution.

3.  The Kentucky Courts misapplied *Dusky v. United States*, 362 U.S. 402 (1960), *Pate v. Robinson*, 383 U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S. 162 (1975), thereby denying Johnson due process by permitting a retrospective competency hearing.

4.  Johnson was incompetent at the time of the plea.

5.  Trial counsel was ineffective by failing to work with experts and cutting short pre-trial investigation toward establishing Johnson's competency and insanity defense.

6.  Don Johnson was denied effective assistance of counsel in the investigation, preparation, and presentation of evidence impacting the penalty phase of trial.

7.  The Kentucky courts' findings of fact are inconsistent with the evidence presented in the state court, and the cumulative weight of the evidence does not support the courts' application of *Machibroda v. United States*.

8.  Trial counsel were ineffective in not withdrawing Don Johnson's plea.[14]

*Id.* at 2-3.  On behalf of the Respondent, the Office of the Kentucky Attorney General filed a response in opposition to Johnson's petition.  *See* R. 20.  Johnson then filed a reply brief in support of his petition.  *See* R. 27-1.  The Respondent later supplemented the record by filing copies of relevant briefs and opinions from the proceedings in state court.  *See* R. 36.

Johnson also filed a motion for discovery and an evidentiary hearing.  *See* R. 32. Johnson first sought additional evidence related to his ineffective assistance of counsel claims. *See id.* at 4-9.  Johnson then argued that while "the face of the record" demonstrated that his

---

[14] Johnson asserted his claims in a different order in his petition.  However, the Court will analyze the claims in this order because it is roughly the order in which the claims arose during the procedural history.

guilty plea was not entered knowingly, voluntarily, and intelligently, he should be given the chance to depose his former trial attorneys if the Respondent tried to prove his plea was valid "through evidence extrinsic to the guilty plea transcript." *Id.* at 9.  The Respondent opposed Johnson's requests, *see* R. 33, and Johnson filed a reply brief in support of them, *see* R. 35.

The Court issued an Opinion and Order denying without prejudice Johnson's motion for discovery and an evidentiary hearing.  *See* R. 38.  The Court explained that its review was generally limited to the record that was before the state court, though it noted that Johnson could potentially renew his motion depending upon the Court's analysis of his claims.  *See id.* At that point, Johnson's petition became ripe for this Court's review.

## II.  STANDARD OF REVIEW

AEDPA, 28 U.S.C. § 2254(d), governs habeas petitions.  Section 2254(d) states that this Court may grant a habeas petition filed by a state prisoner with respect to "any claim that was adjudicated on the merits in State court proceedings" only if:  (1) the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) the state court decision was "based on an unreasonable determination of the facts" in light of the record before it.  AEDPA imposes on federal courts a highly deferential standard of review of state court judgments.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[AEDPA] is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" (citations omitted)).

III.  ANALYSIS

*A.  The Validity of Johnson's Guilty Plea*

Johnson claims that his guilty plea was not entered knowingly, voluntarily, and intelligently.  *See* R. 1 at 40-44.  That is because the trial court did not inform him that he had the constitutional right to a jury trial and privilege against compulsory self-incrimination and would be waiving those rights by pleading guilty.  *See id.*  Johnson argues that, by failing to sufficiently cover these matters during his plea colloquy, the trial court ran afoul of the United States Supreme Court's decision in *Boykin*, 395 U.S. at 238, thus rendering his guilty plea invalid.  *See* R. 1 at 42-44.

As an initial matter, it is undisputed that the trial court did not require Johnson to complete a written guilty plea form containing a waiver of his rights.  *See Johnson*, 103 S.W.3d at 692 ("there is no official written plea form signed by [Johnson] in the record); *id.* at 699 (Keller, J., dissenting) ("the trial court did not require [Johnson] to complete a written guilty plea form").  The parties also agree that the trial court failed to mention the words "jury" and "self-incrimination" during Johnson's plea colloquy.  *See* R. 1 at 43-44; R. 20 at 15-17.  These facts are what prompted three justices on the Kentucky Supreme Court to file a dissenting opinion on direct appeal and state that Johnson's guilty plea should be vacated.  *See Johnson*, 103 S.W.3d at 699-700 (Keller, J., dissenting).  Still, a majority of the justices disagreed with this conclusion and rejected Johnson's claim that his guilty plea was invalid.  *See id.* at 691.

Despite Johnson's claim to the contrary, he has not demonstrated that the Kentucky Supreme Court's majority opinion was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.

37

In fact, the Kentucky Supreme Court correctly recognized that *Boykin* "does not require a separate enumeration of rights waived and separate waivers as to each." *Johnson*, 103 S.W.3d at 691 (citing *Boykin*, 395 U.S. at 238). The United States Court of Appeals for the Sixth Circuit has repeatedly made the same point, indicating that *Boykin* and due process principles do "'not require separate enumeration of each right waived.'" *United States v. Taylor*, 281 F. App'x 467, 470 (6th Cir. 2008) (quoting *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir. 1975)); *see also Campbell v. Marshall*, 769 F.2d, 314, 324 (6th Cir. 1985) (recognizing that no precise litany of rights waived is required). Instead, "[t]he validity of a guilty plea is assessed by reviewing the totality of the circumstances surrounding the plea." *Wilson v. Fender*, No. 20-4168, 2021 WL 3642334, at *4 (6th Cir. May 11, 2021) (discussing *Boykin* and its progeny); *see also United States v. Maley*, No. 2:13-cv-07291-DCR-EBA, 2014 WL 1576996, at *4 (E.D. Ky. Apr. 18, 2014) ("A plea of guilty is valid if it is entered voluntarily and intelligently, as determined under the totality of the circumstances." (citations omitted)).

Here, as the Kentucky Supreme Court suggested, the totality of the circumstances indicate that Johnson's guilty plea was entered knowingly, voluntarily, and intelligently. *See Johnson*, 103 S.W.3d at 691-92. With respect to Johnson's right to a jury trial, the Kentucky Supreme Court correctly recognized that, prior to pleading guilty, Johnson filed a lengthy memo in which he discussed his rights to a trial by jury on both guilt and punishment and expressed his desire to waive those rights and proceed before the trial court. *See id.*; *see also* Johnson's Pre-Plea Mem., June 9, 1994. The Kentucky Supreme Court also accurately recalled that Johnson "vigorously continued to pursue sentencing by the trial court instead of a jury throughout [interlocutory] appellate litigation," further suggesting "that his unswerving trial

strategy involved adamant avoidance of a jury trial and a jury sentencing recommendation." *Johnson*, 103 S.W.3d at 692.   As the Kentucky Supreme Court aptly put it, Johnson "assiduously evaded a jury trial." *Id.*   Thus, there is simply no merit to Johnson's claim of error regarding his right to a such a trial.

Johnson's argument regarding his privilege against compulsory self-incrimination is likewise unavailing.   After all, the record indicates that Johnson initially pled not guilty, contested the charges against him, and even moved to suppress certain incriminating statements he made to the police.   *See* Johnson's Mot. to Suppress, June 13, 1990.   Johnson then decided to plead guilty, and, when he did, he acknowledged that he was changing his plea and was also waiving his right to a speedy and public trial, his right to require the state to prove his guilt beyond a reasonable doubt, his right to confront and cross examine witnesses against him, and his right to present evidence in his own defense.   *See* Tr. of Guilty Plea Hr'g, June 17, 1994 at 8-9.   This broader context undercuts Johnson's claim that he was somehow unaware that he had the right not to incriminate himself and would be waiving that right by pleading guilty.   In other words, as the Kentucky Supreme Court suggested when it reviewed Johnson's plea colloquy, the totality of the circumstances indicate that Johnson was well aware of the rights he was waiving.   *See Johnson*, 103 S.W.3d at 691.   Thus, Johnson is not entitled to habeas relief on this claim.

### B.  The Trial Judge's Consideration of Mitigation Evidence

Johnson also claims that the "trial judge failed to consider and give effect to all evidence presented in mitigation of a death sentence in violation of [his] rights under the Eighth and

Fourteenth Amendments of the United States Constitution."  R. 1 at 14.  Johnson therefore claims that this Court should vacate his sentence.  *Id.* at 74.

As an initial matter, it is worth noting that Johnson does *not* raise a claim of error based on the fact that the trial judge sentenced him rather than a jury.  Johnson did raise that issue in his direct appeal to the Kentucky Supreme Court, *see* R. 36-2 at 54, but he has not asserted it in his present petition.  Johnson has not cited, let alone relied on, cases like *Ring v. Arizona*, 536 U.S. 584 (2002), or its progeny, which indicate that, as a general matter, the Sixth Amendment requires that a jury find any fact necessary for application of the death penalty. This may be because Johnson was the one who repeatedly insisted on having the trial judge sentence him rather than a jury.  Again, as the Kentucky Supreme Court put it, Johnson "vigorously continued to pursue sentencing by the trial court instead of a jury throughout appellate litigation," including during his opposition to the Commonwealth's interlocutory appeal regarding sentencing.  *Johnson*, 103 S.W.3d at 692.  In other words, Johnson's "unswerving trial strategy involved adamant avoidance of a jury trial and jury sentencing recommendation."  *Id.*  Whatever the reason, Johnson does not raise a claim based on the fact that the trial judge sentenced him instead of a jury.[15]  Thus, that matter is not before this Court.

Johnson instead claims that the problem with his sentence was that the trial judge failed to consider and give effect to all evidence presented in mitigation of a death sentence.  *See* R.

_____

[15] Johnson does say at one point in his reply brief, "[C]onsider if [he] had faced a jury trial and the judge was a prospective member of that jury."  R. 27-1 at 19.  However, in this hypothetical, Johnson was simply arguing that, "[w]hether judge or juror, the sentencer must consider mitigating evidence."  *Id.* at n.10.  Johnson does not raise a claim of error based on the fact that the trial judge sentenced him rather than a jury.

1 at 14.  The Respondent argues that this claim is procedurally defaulted because Johnson did not present the issue to the Kentucky Supreme Court.  *See* R. 20 at 8.  That argument, however, is without merit because Johnson *did* raise this issue in his direct appeal to the Kentucky Supreme Court; indeed, Johnson argued in his appellate brief that the trial court did not adequately "consider[ ] all the mitigating evidence" he presented at sentencing.  R. 36-2 at 140. The Kentucky Supreme Court then addressed that matter in its decision, noting that while Johnson claimed that "the trial court's comments at final sentencing prevented his mitigating evidence from being considered," that claim of error simply lacked merit.  *Johnson*, 103 S.W.3d at 697.  Thus, Johnson's claim is not procedurally defaulted.

Although Johnson's mitigation-evidence claim is properly before this Court, it nevertheless lacks merit.  That is because Johnson has not established that the Kentucky Supreme Court's resolution of his claim was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.  To be sure, Johnson cites multiple United States Supreme Court decisions, including *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978), which established that, under the Constitution, the sentencer must be permitted to consider all relevant mitigating evidence in a capital case.  However, Johnson has not demonstrated that the trial judge failed to consider the mitigating evidence in his case.

If anything, the record shows that the trial judge permitted Johnson to introduce extensive mitigation evidence, including his own testimony, the testimony of six other witnesses, and over two dozen exhibits.  *See* Tr. of Sent. Hr'g, Sept. 2-5, 1997, at vols. IV-VII, X-XVII.  Johnson even acknowledges in his petition that "[t]he record is replete with evidence"

41

in mitigation.  R. 1 at 15.  The record also shows that the trial judge reviewed and discussed

Johnson's mitigation evidence at length, including but not limited to the fact that he had no

significant prior criminal history, suffered from multiple mental and emotional disorders, was

relatively young when he committed his crimes, was abused as a child, and had failed

educational opportunities.  *See* Tr. of Sent. Hr'g, Sept. 6, 1997, at 57-59.  The trial judge then

reaffirmed that he had "considered the evidence *in its entirety*, including evidence offered in

aggravation *and in mitigation of penalty*," before imposing his sentence.  *Id.* at 59 (emphasis

added).  In light of the foregoing, Johnson has not established a constitutional violation.

Still, Johnson argues that it is clear from the trial judge's words at the sentencing

hearing "that he was unable to consider and give effect to the evidence presented in

mitigation."  R. 1 at 17.  Johnson specifically objects to the following statements made by the

trial judge at sentencing:

> There's a lot of evidence that you had heard voices in your past, that you hallucinated, those types of things.  I heard no evidence whatsoever that at the time you committed this act that you heard any voices or that you hallucinated.  You said, "I just lost it.  I got mad."

> It's now come the norm in these types of cases to blame everybody but yourself.  You blame your dad.  If you'd a killed your dad, I might have understood that.  You blame your siblings.  You blame your mother.  You blame all the teachers that you've ever had.  You blame all the probation officers that you've ever had.  You blame everybody.  God help us as a society if it gets to the point that you can blame everybody else and justify not facing the maximum penalty for committing an act like you did.

Tr. of Sent. Hr'g, Sept. 30, 1997, at 14.  Johnson, however, has not explained in any clear way

how these statements prove that the trial judge did not consider Johnson's mitigation evidence.

Again, the trial judge discussed the mitigation evidence at length and repeatedly indicated that

he gave a great deal of consideration to that evidence in imposing his sentence.  *See* Tr. of Sent. Hr'g, Sept. 6, 1997, at 57-59; Tr. of Sent. Hr'g, Sept. 30, 1997, at 12.  The Kentucky Supreme Court then reviewed the trial judge's comments and found no merit to the claim that those comments prevented Johnson's mitigating evidence from being considered.  *Johnson*, 103 S.W.3d at 697.  In the end, Johnson has not demonstrated that this conclusion was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.  Thus, Johnson is not entitled to habeas relief on this claim.

### C.  Permitting a Retrospective Competency Hearing

Johnson next claims that the state courts violated his due process rights by permitting a retrospective competency hearing in his case.  Johnson, however, has not shown how this decision was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.

To be sure, Johnson cites three United States Supreme Court cases to support his claim: *Dusky v. United States*, 362 U.S. 402 (1960), *Pate v. Robinson*, 383 U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S. 162 (1975).  Johnson then argues that, in each case, the Supreme Court "noted its distaste for retrospective competency determinations."  R. 1 at 44.  While there is certainly some early Supreme Court case law that "disfavors retrospective competency hearings, it by no means forbids them."  *Kelly v. Smith*, No. 5:17-cv-437-KKC, 2019 WL 2189511, at *7 (E.D. Ky. May 21, 2019).  In fact, various federal circuit courts have made this abundantly clear.  *See id.* (making the same point and citing *United States v. Duncan*, 643 F.3d 1242, 1250 (9th Cir. 2011); *Maynard v. Boone*, 468 F.3d 665, 675 (10th Cir. 2006); *Miller v.*

43

*Dugger*, 838 F.2d 1530, 1544 (11th Cir. 1988); *United States v. Renfroe*, 825 F.2d 763, 767 (3d Cir. 1987)). Plus, as this Court has mentioned, "the Sixth Circuit 'recognizes that a retrospective determination may satisfy the requirements of due process provided it is based on evidence related to observations made or knowledge possessed at the time of trial.'" *Kelly*, 2019 WL 2189511, at *7 (quoting *Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995)).[16] Johnson even concedes this point, acknowledging that "retrospective hearings are *not* banned per se," and, in fact, can be held in accordance with due process so long as the trial court "can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." R. 1 at 44-45 (emphasis added).

Since a retrospective competency hearing can be held in accordance with due process, the only question then is whether the specific hearing in Johnson's case was permissible. Johnson argues that there is a list of "[f]actors a court should consider concerning the feasibility of a retrospective competency hearing," including but not limited to: "(1) the passage of time; (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations; (3) any statements by the defendant in the trial record; and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with the defendant before and during trial, including the trial judge, counsel

---

[16] This Court recognizes that the Sixth Circuit's decision in *Cremeans* appears to have been abrogated by the Supreme Court's subsequent ruling in *Thompson v. Keohane*, 516 U.S. 99 (1995). The Sixth Circuit discussed this issue in *Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000). That abrogation, however, involved a separate issue: whether a state court's determination regarding a defendant's competency should be characterized as a question of fact or a mixed question of law and fact. The abrogation did not call into question the Sixth Circuit's recognition that retrospective competency hearings may comport with due process.

for both the government and the defendant, and jail officials." *Id.* at 45 (citing *Reynolds v. Norris*, 86 F.3d 796, 802-03 (8th Cir. 1996)).

Johnson's list of factors is accurate. The problem for him is that these are the very factors that the state courts examined in concluding that a retrospective competency hearing could be held in his case. Indeed, when the trial court determined that it would be possible to conduct a retrospective competency hearing, it explained its reasoning by saying:

> This Judge presided over that event where the defendant pled guilty. This Judge did observe that defendant during that time, observe his interaction with his attorneys, not completely, but at least in open Court. There wasn't a sufficient lapse of time between this retrospective hearing and the trial in this case. The Supreme Court has spoken as seven years not being a too lengthy period of time. There is a transcript of the relative proceedings which have been referred to by both counsel today, at least their interpretations of what the record revealed. There are mental examinations that were conducted close in time.

Tr. of Hr'g, July 2, 2001, at 47. The trial court also recognized "[t]he availability of recollections of non-experts, including counsel and the Trial Judge's," before concluding "that the quantity and quality of the available evidence is sufficient for the Court to conduct it's retrospective hearing and reach a decision as to Mr. Johnson's competency at the time of the entry of his plea." *Id.* at 48.

Likewise, in resolving Johnson's direct appeal, the Kentucky Supreme Court explained:

> Some factors bearing upon the permissibility of a retrospective competency hearing are: 1) the length of time between the retrospective hearing and the trial, 2) the availability of transcript or video record of the relevant proceedings, 3) the existence of mental examinations conducted close in time to the trial date, and 4) the availability of the recollections of non-experts—including counsel and the trial judge—who had the ability to observe and interact with the defendant during trial. No single factor is determinative, and the issue should be decided on a case-by-case basis.

*Johnson*, 103 S.W.3d at 693 (citations omitted).

45

The Kentucky Supreme Court then reviewed the underlying record and recognized that the trial court had considered the foregoing factors. *See id.* The court explained that the trial judge noted "as significant the availability of the trial court's personal observations of [Johnson] prior to and during the entry of the plea, including [his] interaction with trial counsel; the availability of psychological reports and trial counsel's opinion as to competency; and the availability of a transcript of the relevant proceedings." *Id.* The court also noted that the trial judge "considered it significant that there were mental examinations performed close in time to the entry of the plea." *Id.* Finally, the court pointed out, with respect "to the time lapse between the plea entry and the competency hearing," the trial judge referred to a previous Kentucky Supreme Court opinion indicating "that seven years between the trial and the retrospective hearing was not enough in and of itself to deny . . . due process." *Id.* Given the trial judge's consideration of the relevant factors, the Kentucky Supreme Court concluded that "there was sufficient evidence to sustain the trial court's view that a retrospective hearing was adequate." *Id.* Thus, the court held that "there was no error." *Id.*

At most, Johnson now suggests that the state courts should have balanced the factors differently and concluded a retrospective competency hearing could not be held in his case. *See* R. 1 at 47-50. But Johnson is not entitled to habeas relief simply because he disagrees with how the state courts weighed the relevant factors. Ultimately, the state courts' factual findings are presumed correct, and Johnson has not identified clear and convincing evidence that those findings were unreasonable, as required to obtain habeas relief. *See* 28 U.S.C. § 2254(e)(1); *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010). Thus, Johnson is not entitled to habeas relief on this claim.

46

### D.  Johnson's Competency

There is likewise no merit to Johnson's claim that he is entitled to habeas relief because he was incompetent at the time of his plea.  Tellingly, Johnson devotes only one page of his petition to this argument, *see* R. 1 at 50-51, and his claim is simply not supported by the evidence in the record.  In fact, a review of the record shows that the trial court and the Kentucky Supreme Court thoroughly considered Johnson's competency.

For starters, once the trial court determined that a retrospective competency hearing was permissible, it held a comprehensive hearing in which multiple witnesses testified.  For example, Dr. Deland of the KCPC testified to his knowledge in June of 1994.  *See* Tr. of Hr'g, Aug. 29-30, 2001, at vol. II at 236-39.  Dr. Deland indicated that he was aware Johnson was intending to plead guilty and evaluated Johnson in order to update his competency status ahead of that change in his plea.  *See id.* at vol. II at 238.  Given those circumstances, Dr. Deland testified that he was thorough and in fact "left no stone unturned" in examining Johnson's understanding of "the court process."  *Id.*  Dr. Deland testified that Johnson "had much more than just a rote understanding of what was going on" and actually had "a very deep understanding of" the issues involved.  *Id.* at vol. II at 239.  Dr. Deland also testified that he "never got an indication" from Johnson's trial attorneys that "they had concerns about his abilities to understand things in a substantial way."  *Id.* at vol. II at 253.  Dr. Deland testified that, in his opinion, Johnson was competent to stand trial, and he had issued his written report to that effect just three days before Johnson pled guilty.  *See id.* at vol. II at 236-39.

Dr. Berland, the psychologist who had previously been hired by the defense team, also testified at the retrospective competency hearing.  *See id.* at vols. I and II.  On both direct and

47

cross-examination, Dr. Berland acknowledged that he had not been able to conclude that Johnson was incompetent when he spoke with him prior to pleading guilty. *See id.* at vol. I at 88, 135. Other evidence was also introduced at the retrospective competency hearing. *See id.* at vols. I, II, and III. Ultimately, at the end of the multi-day evidentiary hearing, the trial court concluded that Johnson had been competent to enter his guilty plea in June of 1994. *See id.* at vol. II at 282-83.

The Kentucky Supreme Court then reviewed the trial court's findings on direct appeal and rejected Johnson's arguments regarding his competency. *See Johnson*, 103 S.W.3d at 694. The court explained its reasoning, saying:

> . . . KCPC psychiatrist Frank Deland testified at the August 29–30, 2001 hearing to his knowledge at the time just prior to entry of the guilty plea. Dr. Deland stated that based upon his discussions with [Johnson's] trial attorneys, he had been aware that [Johnson] was going to enter an open-ended plea. Dr. Deland testified that the report issued three days before the plea was based upon an evaluation conducted specifically to update [Johnson's] competency status in light of the impending plea. Given the significance of the plea, according to Dr. Deland's testimony, he had wanted to be very thorough regarding [Johnson's] understanding of the court process. Dr. Deland testified that he had concluded that Appellant had "much more than a rote understanding of what was going on," and in fact had "a very deep understanding of these issues."
>
> Dr. Deland further testified that he had received no indication from [Johnson's] two trial attorneys that they were concerned about [Johnson's] competency. DPA psychologist Dr. Berland admitted on both direct and cross-examination that he had not been able to conclude that [Johnson] was incompetent when he spoke to him prior to the guilty plea.

*Johnson*, 103 S.W.3d at 694. In light of the foregoing, the Kentucky Supreme Court concluded that there was sufficient evidence to support the trial court's retrospective finding of competency. *Id.*

This Court detects no error by either the trial court or the Kentucky Supreme Court, let alone the kind of error that would warrant habeas relief in this case. And while Johnson nevertheless insists that he was incompetent when he pled guilty, *see* R. 1 at 50-51, he has not demonstrated in any clear way how the state courts' decisions regarding his competency were contrary to, or involved an unreasonable application of, clearly established federal law or were based on an unreasonable determination of the facts. At most, the case law that Johnson cites simply confirms that competency determinations are inherently "difficult" and involve "subtle nuances." *Drope*, 420 U.S. at 180. Johnson certainly has not established that the state courts resolved the competency matter in his case in a way that would justify vacating his convictions.

Finally, Johnson suggests he is entitled to habeas relief because of how the Kentucky Supreme Court addressed the competency issue in his initial state post-conviction appeal. *See* R. 1 at 51. In that appeal, Johnson again argued he was incompetent when he pled guilty but claimed he had "new evidence" of his incompetence. *See* R. 36-2 at 497-500. Specifically, Johnson alleged that Dr. Berland was only able to complete his evaluation after Johnson's direct appeal was over and after he was placed on the anti-psychotic medication known as Trilafon. *See id.*

The Kentucky Supreme Court, however, rejected Johnson's claim. *See Johnson*, 2008 WL 4270731, at *6. The court determined that Johnson was simply trying to "relitigate an issue already decided in the retrospective competency hearing." *Id.* The court also added that "Dr. Berland's inability to conclude his evaluation in 1994 was taken into consideration in the retrospective competency hearing as part of his opinion as to Johnson's competence." *Id.* Thus, the court denied Johnson's competency argument. *See id.*

49

While Johnson now suggests that there was something fundamentally wrong with how the Kentucky Supreme Court resolved his claim, he has not clearly identified the court's error or shown that it was based on an unreasonable determination of the facts. Johnson has also not cited any legal authority which proves that the Kentucky Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. Thus, Johnson is not entitled to habeas relief on this claim.

### E. Ineffective Assistance of Counsel Claim
### Regarding the Investigation into Johnson's Competency

Johnson next claims that his "trial counsel was ineffective by failing to work with experts and cutting short a pre-trial investigation toward establishing" a defense based on incompetence and insanity. R. 1 at 51. Johnson repeatedly suggests that, but for his trial counsel's errors, he would not have pled guilty and, instead, would have proceeded to trial. *See id.* at 55, 61-64.

It is certainly true that, pursuant to the Sixth Amendment, criminal defendants like Johnson enjoy the right to the effective assistance of counsel. *See Strickland*, 466 U.S. at 686. In order to establish a violation of that right, a petitioner must demonstrate two things. *See id.* First, the petitioner must show that his attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* Second, the petitioner must show that his attorney's deficient performance prejudiced his defense, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

That said, the Kentucky Supreme Court already applied the *Strickland* framework and rejected Johnson's ineffective assistance claim, *see Johnson*, 2008 WL 4270731, at *5 (citing *Strickland*, 466 U.S. at 687-88), and, under AEDPA, federal courts only ask whether the state court reasonably applied *Strickland*'s already-deferential inquiry.  *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing 28 U.S.C. § 2254(d)).  In other words, "we must give double deference to the state court's determination."  *Hodge v. Jordan*, 12 F.4th 640, 643 (6th Cir. 2021) (citing *Harrington*, 562 U.S. at 105).  So, in order to succeed, Johnson must show that the Kentucky Supreme Court either unreasonably applied *Strickland* to his claim that his trial counsel provided ineffective assistance or based its decision on an unreasonable determination of the facts.

Johnson has failed to carry his burden.  In fact, as best as the Court can tell, Johnson has not cited any legal authority demonstrating that the Kentucky Supreme Court unreasonably applied *Strickland* in resolving his ineffective assistance claim, and he has not established in any clear way that the state court's decision was based on an unreasonable determination of the facts.  If anything, as the Respondent points out, Johnson appears to simply repeat the same argument about his trial counsel that he already presented to the Kentucky Supreme Court.  *See* R. 36-2 at 500-03; *see also Johnson*, 2008 WL 4720731, at *4-5.  Since this Court does not directly review the conduct of trial counsel but instead reviews the Kentucky Supreme Court's decision through AEDPA's double deferential lens, *see Smith v. Taylor*, No. 5:10-cv-091-KKC-HAI, 2014 WL 3513180, at *3 (E.D. Ky. July 16, 2014), Johnson's argument necessarily does not get off the ground.

51

Plus, even if Johnson was not just reasserting the same ineffective assistance argument, the Kentucky Supreme Court reasonably resolved his claim. The Kentucky Supreme Court explained in detail that its review of the record showed "that defense attorneys employed a defense expert to develop a defense based on incompetence or insanity, but the trial court was persuaded by the opinion of the . . . KCPC psychiatrist that Johnson was not incompetent." *Johnson*, 2008 WL 4270731, at *4. And while Johnson continued to claim that his attorneys failed to "follow through on [Dr. Berland's] medication recommendations," R. 36-2 at 501, the Kentucky Supreme Court said it found "no basis for Johnson's assertion that counsel 'abandoned' the effort to develop a defense because they did not uncover any incompetence and did not ensure that [Johnson] was medicated with the antipsychotic drug suggested by Dr. Berland." *Johnson*, 2008 WL 4270731, at *4. The court also noted that Johnson was taken to KCPC for treatment and evaluation and stated that "it was not the job of the attorneys to say what his treatment or medication should be." *Id.* The court then emphasized that, in the end, "none of the experts, including the defense psychologist, expressed an opinion that Johnson was incompetent at the time that he pled guilty." *Id.* Thus, the court determined that Johnson failed to establish ineffective assistance. *Id.*

Notwithstanding the Kentucky Supreme Court's thorough analysis and resolution of his claim, Johnson reasserts his arguments in his present petition. *See* R. 1 at 22-24, 51-64. Johnson makes much of the fact that Dr. Berland had "recommend[ed] that Johnson be properly medicated with Trilafon or Prolixin" so that he could "obtain an accurate picture of [Johnson's] mental health status at the time of the crimes," but that this never happened. *Id.* at 22; *see also id.* at 51-55, 58-61, 63-64. But, again, as the Kentucky Supreme Court pointed

out, the underlying record shows that Johnson's trial counsel still thoroughly investigated his mental state and repeatedly litigated the matter, including at the guilty plea stage, during his multi-day sentencing hearing, and even years later at the retrospective competency hearing. Johnson has also not cited any legal authority that proves his counsel's actions vis-à-vis Dr. Berland's medication recommendation amounted to constitutionally deficient performance, let alone establishes that the Kentucky Supreme Court's resolution of his claim was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.

Johnson's reliance on the United States Supreme Court's decision in *Wiggins* is also unavailing. As the Kentucky Supreme Court correctly pointed out when it resolved Johnson's claim, *Wiggins* is distinguishable from his case. *See Johnson*, 2008 WL 4270731, at *5 (citing *Wiggins*, 539 U.S. at 510). After all, in *Wiggins*, the attorneys failed to investigate the defendant's history—beyond reviewing a few brief documents—and presented none of the relevant information to the court. *See Wiggins*, 539 U.S. at 523-27. In contrast, Johnson's attorneys thoroughly investigated his background and mental state and litigated these issues. *See Johnson*, 2008 WL 4270731, at *5. To illustrate the point, the Kentucky Supreme Court highlighted the fact that "the doctor for KCPC recalled in the retrospective competency hearing that counsel shared with him a thorough background investigation consisting of about fifteen pages of notes." *Johnson*, 2008 WL 4270731, at *5. This finding is supported by the record. *See* Tr. of Hr'g, Aug. 29-30, 2001, at vol. II at 242 (in which the doctor notes that the defense attorneys "had compiled a fairly detailed personal history of Mr. Johnson" that "was about fifteen . . . typewritten pages"). Given these facts, the Kentucky Supreme Court reasonably

53

concluded that Johnson could not show that his attorneys' performance was deficient, let alone that their performance prejudiced his defense, as required to establish an ineffective assistance of counsel claim. *See Johnson*, 2008 WL 4270731, at *5 (citing *Strickland*, 466 U.S. at 687). And since Johnson has not cited any legal authority in his present petition that calls into question the Kentucky Supreme Court's conclusions, his habeas claim fails.

*F.  Ineffective Assistance of Counsel Claims*
*Regarding the Investigation, Preparation, and Presentation of Evidence*
*During the Penalty Phase*

Johnson next argues that he was "denied effective assistance of counsel in the investigation, preparation, and presentation of evidence impacting the penalty phase of trial." R. 1 at 21. Johnson identifies four acts or omissions he argues constituted deficient performance: (1) the failure to call Dr. Strobel as a witness even though he had observed Johnson in 1987 and "diagnosed him as a paranoid schizophrenic;" (2) the failure "to obtain and present readily available evidence of an extensive history of mental illness in Johnson's family;" (3) the "failure to counter Dr. Deland's 'voices' testimony;" and (4) the "failure to explain through [an] expert witness that evidence of overkill is an indicator that Johnson was in a frenzied manic state."[17] *Id.* at 25-34. Johnson then argues that these "numerous deficiencies of counsel— whether considered singly or in combination—rendered the outcome of [his] sentencing trial wholly unreliable." *Id.* at 34.

---

[17] Johnson also alleges that his trial attorneys were ineffective "by failing to follow through on investigating his mental health, including on following their own expert's recommendation that [he] be properly medicated with Trilafon or Prolixin in order for the expert to obtain an accurate picture of his mental health status at the time of the crimes." R. 1 at 22. However, Johnson also asserted that argument in a separate claim for relief, which this Court already addressed. *See supra* Part III.E. (resolving Johnson's claim that his trial counsel's investigation into his competency amounted to ineffective assistance).

In presenting the foregoing claims, Johnson once again essentially repeats the same arguments that he previously asserted in his state post-conviction appeal to the Kentucky Supreme Court, albeit to no avail.  *See* R. 36-2 at 505-11; *see also Johnson*, 2008 WL 4720731, at *5-6.  In other words, Johnson does not clearly explain how the Kentucky Supreme Court's resolution of his claims was unreasonable.  As this Court has explained, the nature of AEDPA double deference means that Johnson's claims are unavailing from the outset.

Moreover, even if Johnson was not restating his same ineffective assistance arguments, this Court has not identified the kind of error in the Kentucky Supreme Court's resolution of his claims that would justify habeas relief.  With respect to Johnson's claim that his trial counsel was ineffective by failing to call Dr. Strobel as a witness during the penalty phase, the Kentucky Supreme Court correctly pointed out "that defense counsel was aware of the contents" of the doctor's records, other experts were questioned about them during the retrospective competency hearing, and the records were entered into evidence during the sentencing hearing. *Johnson*, 2008 WL 4270731, at *5.  Johnson even acknowledged to the Kentucky Supreme Court that "the hospital records were entered into evidence."[18]  R. 36-2 at 505 (citing Tr. of Sent. Hr'g, Sept. 2-5, 1997, at vol. XIV, at 1501-07).  Given these facts, the Kentucky Supreme Court concluded that "Dr. Strobel would not have been able to shed any more light on [Johnson's] mind set years after the diagnosis than those doctors who examined him for trial" and that the "[f]ailure to call the doctor for trial was not ineffective assistance." *Johnson*, 2008 WL 4270731, at *5.  Johnson has simply failed to show how this decision was unreasonable.

---

[18] Johnson also admits in his present petition that "the hospital records were entered into evidence." R. 1 at 25.

With respect to Johnson's claim that his trial counsel was ineffective by failing to put on evidence that, in the past, different members of his family had a history of mental illness, the Kentucky Supreme Court understandably focused on the fact that counsel had thoroughly investigated "the crucial question of Johnson's *own* possible mental illness." *See id.* at *6 (emphasis added). Indeed, the record shows that the defense presented extensive mitigation evidence regarding Johnson's mental health disorders, including the fact that he was diagnosed with latent schizophrenia, polysubstance abuse, attention deficit disorder, and explosive personality disorder, among other conditions. *See* Tr. of Sent. Hr'g, Sept. 2-5, 1997, vol. VI at 636. The record also shows that the defense established that Johnson had an incredibly dysfunctional childhood marred by abuse, and that its own expert, a clinical psychologist, testified at length about how Johnson's anger and hostility emanated "directly from a horrendous family and developmental background." *Id.* at 639; *see also* vols. IV-VII, X-XVII (setting forth the defense's mitigation evidence). In light of this evidence, Johnson has not established that the Kentucky Supreme Court's resolution of his claim was unreasonable.

With respect to Johnson's claim that his trial counsel was ineffective by failing to counter Dr. Deland's "voices" testimony, the Kentucky Supreme Court accurately noted that the prosecution simply presented this as rebuttal evidence and that Johnson had already introduced extensive evidence from his own experts regarding his mental health disorders, including his latent schizophrenia. *See Johnson*, 2008 WL 4270731, at *6. In other words, Johnson failed to show "there was some defense that counsel did not investigate or present." *Id.* To be sure, Johnson characterizes Dr. Deland's testimony as "very damaging" and suggests that, if it had been impeached, the result of his sentencing hearing may have been different.

But Johnson's argument is, at most, speculation, and he has not cited any legal authority that directly advances his position or otherwise demonstrates that the Kentucky Supreme Court's resolution of his claim was unreasonable.

Finally, with respect to Johnson's claim that his trial counsel was ineffective by failing to introduce evidence of so-called "overkill," the Kentucky Supreme Court similarly characterized this claim as speculation, explaining that it was not clear "that this subject matter would have made a difference to the judge's sentencing decision." *Id.* Although Johnson repeats his argument in his petition, he again cites no legal authority to support his position, and he certainly has not shown that the Kentucky Supreme Court's characterization of his claim was unreasonable.

In sum, Johnson asserts several ineffective assistance claims related to the penalty phase. Those claims, however, lack merit because Johnson is simply repeating the same arguments that he already presented to the Kentucky Supreme Court, and, in any event, he has not identified the kind of error in the resolution of his claims that would justify habeas relief.

### G. Johnson's Claim that
### He Had an Agreement with the Trial Judge

Johnson next highlights the fact that, in his state post-conviction motion, he alleged that "he pled guilty with no sentencing recommendation from the Commonwealth because he believed he had an agreement with the judge that if he pled guilty, he would not receive a death sentence. This belief was based on lead counsel's conduct and the judge's conduct." R. 1 at 64. This matter was explored at the most recent evidentiary hearing, and the trial court ultimately ruled against Johnson. *See* R. 36-2 at 636-43. The Kentucky Supreme Court then reviewed

the matter, applied *Machibroda*, and rejected Johnson's arguments. *Johnson*, 412 S.W.3d at 157. Johnson now claims in his petition that "[t]he Kentucky courts' findings of fact are inconsistent with the evidence presented in the state court, and the cumulative weight of the evidence does not support the courts' application of *Machibroda*." R. 1 at 64.

Johnson's claim is unavailing. As an initial matter, Johnson has not cited any legal authority showing that the state courts' resolution of his claim was contrary to, or involved an unreasonable application of, clearly established federal law. Moreover, despite Johnson's repeated arguments to the contrary, he has not demonstrated that the decision to deny his claim was based on an unreasonable determination of the facts.

Under the law, "[s]tate-court factual findings . . . are presumed correct" and "the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (quoting 28 U.S.C. § 2254(e)(1)). Johnson simply has not met this heavy burden. In fact, a review of the record makes it clear that the state courts thoroughly reviewed the merits of Johnson's claims and reasonably resolved the issues.

For starters, special judge Eddy Coleman held an exhaustive, multi-day evidentiary hearing over a number of months to consider whether there was improper judicial interference in the plea process and whether Johnson's lawyers coerced him by threatening to withdraw if he refused to plead guilty. *See* Post-Conviction Evid. Hr'g, Apr. – June, 2010. The hearing lasted many hours and examined precisely what had transpired in the time leading up to Johnson's guilty plea. *See id.* Fourteen witnesses testified at the hearing, including but not limited to Johnson himself, defense attorneys Mike Williams and Kelly Gleason, and Judge Caudill (the original trial judge). *See id.* Judge Coleman also admitted numerous exhibits into

58

the record.  *See id.*  Ultimately, Judge Coleman found that there was not improper judicial interference in the plea process and that Johnson's trial counsel did not threaten to withdraw if he refused to plead guilty.  *See* R. 36-2 at 636-43.  Thus, Judge Coleman denied Johnson's request for post-conviction relief.  *See id.* at 643.

The Kentucky Supreme Court then carefully reviewed the matter, walking through the relevant evidence from the hearing in exceptional detail.  *See Johnson*, 412 S.W.3d at 158-70. For example, the court noted that Johnson did, in fact, "testif[y] that he believed some sort of deal had been reached," in part because of his interactions with Judge Caudill at the courthouse annex, and that Kelly Gleason likewise interpreted the judge's statements as "assuring them he would not give Johnson death."  *Id.* at 160-61.  On the other hand, the court recognized that Mike Williams "testified that there was no deal and that he had no assurances from the judge" and indicated "that he did not tell Johnson that th[e] conversation [at the annex] meant the judge would not impose death if he entered a blind plea, and that instead he thought it was simply the judge seeing if the parties were close to reaching a deal, that is, a plea bargain."  *Id.* at 163.  The court also pointed out that Williams "denied having threatened Johnson to force him to enter a guilty plea."  *Id.*  The court then discussed how Judge Caudill "testified that there was no 'deal' and that he had no memory of asking Johnson if he would take LWOP 25" but, instead, may have simply "inquired about the possibility of settlement."  *Id.* at 164.

But that is not all.  The Kentucky Supreme Court actually went much further, exploring, over the course of two dozen paragraphs, the nuanced testimony of each of the relevant witnesses and the pertinent documentary evidence in the record.  *See id.* at 160-64.  The court

then analyzed *Machibroda* and recognized that Judge Coleman had rejected Johnson's claims before deferring to Judge Coleman's factual findings and denying relief. *See id.* at 164-66.

This Court has reviewed the extensive underlying video testimony and pertinent exhibits from the post-conviction evidentiary hearing, Judge Coleman's findings of fact and conclusions of law, and the Kentucky Supreme Court's accurate summary of the evidence and its corresponding analysis, and, at bottom, Johnson has not demonstrated he is entitled to relief. At most, Johnson simply recounts the testimony of the various witnesses and suggests it weighs in his favor. *See* R. 1 at 10-12, 64-70.  For example, at one point, Johnson discusses his own testimony and argues that it "was substantiated by other witnesses" at the hearing before saying that "[o]nly two witnesses testified that there was no agreement:  Michael Williams and Judge Caudill." *Id.* at 11.  Johnson thus implies that the trial court should have balanced the evidence differently and reached a contrary conclusion; since it did not, he suggests its factual findings were necessarily unreasonable. *See id.* at 64-70.  But that is not a valid basis for habeas relief. In fact, even if this Court would have reached a different conclusion, that does not mean the state court's factual findings were unreasonable. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) (explaining that a state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

The Kentucky Supreme Court said it well when it resolved Johnson's claims:

> A large portion of Johnson's brief is dedicated to recounting the minutiae of various witnesses' testimony and pointing out how that testimony contradicted the testimony of witnesses supporting Judge Coleman's findings. But that is simply not a sufficient reason to find clear error.  In essence, Johnson claims that because more witnesses testified in his favor, his version of the facts must be true.  But resolving the conflict between the competing versions of the facts is a job for the trial court, not an appellate court.  The special judge did so

in this case and found either that those witnesses were not credible or gave little weight to their testimony.

. . .

Ultimately, this Court concludes that there was substantial evidence to support Judge Coleman's findings that there never was a secret deal and that Johnson's lawyer did not coerce him into pleading guilty by convincing him that there was a deal. Judge Caudill's and Mike Williams's testimony support these findings. That Johnson's supporting witnesses outnumbered and contradicted these witnesses does not make their testimony insubstantial. That Judge Coleman stated that some of these witnesses actually supported his findings, when they may in fact have been more supportive of Johnson's claims, does not change the fact that several witnesses did, in fact, testify that there was no deal and that Johnson was never told there was a deal. Thus, this Court cannot say that the findings were clearly erroneous.

*Johnson*, 412 S.W.3d at 166-68.

Along the same lines, AEDPA imposes a highly deferential standard for reviewing the state courts' factual findings. *See Rice*, 546 U.S. 338-39. This deference certainly "does not imply abandonment or abdication of judicial review." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). But when reasonable minds reviewing the record may disagree about the relevant factual findings, as is the case here, a federal court should not supersede the state courts' determination. *See Loza v. Mitchell*, 766 F.3d 466, 474 (6th Cir. 2014) (citing *Rice*, 546 U.S. at 341-42). Thus, this Court will not disturb the state courts' factual findings.

Likewise, the Court will not disturb the state courts' resolution of Johnson's final argument—i.e., that "*he believed* he had a deal with the judge," even if no actual deal existed, and that the testimony of multiple witnesses supported his "assertion of his belief." R. 1 at 70 (emphasis in the original). As the Kentucky Supreme Court reasonably put it:

> . . . [A]gain, the fact that Johnson has more witnesses to support his claim, and that it might be simpler to disbelieve the testimony of a single witness rather than half a dozen, does not require that his claim be accepted. Such a practice would remove from the trial judge any need to assess the credibility of witnesses or weigh their testimony and instead allow (or even require) the judge to side with whomever has the most witnesses. That is not judging; it is the absence of judgment, requiring only the mechanical weighing of the number of witnesses on each side, and makes a mockery of the scale as a symbol of justice.
>
> . . .
>
> Weighing the proof and judging credibility is the function of the trial judge in such cases. Moreover, this [is] not a case where the judge simply disbelieved the defendant's evidence and based his findings solely on the lack of proof. In this case, there was substantial proof from Mike Williams (as to his interactions with Johnson) to support a conclusion that Johnson did not believe in the existence of a secret deal.
>
> Additionally, this Court cannot say that Judge Coleman's conclusion that Williams did not threaten or otherwise coerce Johnson was clearly erroneous. Like the finding discussed above, there was far more than a scintilla of evidence to support his finding. That is sufficient to require this Court to defer.

*Johnson*, 412 S.W.3d at 169-70. Pursuant to AEDPA, this court will similarly defer to the state courts' findings. Again, those findings are presumed correct, and Johnson certainly has not rebutted that presumption by clear and convincing evidence, as required to obtain relief. *See Rice*, 546 U.S. at 338-39. Thus, Johnson's habeas claim fails.

### H.  Ineffective Assistance of Counsel Claim
### Regarding Trial Counsel's Failure to Withdraw Johnson's Plea

Lastly, Johnson argues that his trial attorneys "were ineffective for failing to allege the secret deal and Johnson's belief a secret deal existed as grounds for withdrawing his guilty plea." R. 1 at 71. Notably, Johnson devotes only a short portion of his petition to this claim, *see id.* at 71-73, and, in any event, his argument is inextricably intertwined with his previous claim, which this Court has already rejected. *See supra* Part III.G. Plus, the Kentucky Supreme Court

already applied the *Strickland* framework to Johnson's claim and rejected it, *see Johnson*, 2008 WL 4270731, at *4, and Johnson has not shown that the court's resolution of his claim was unreasonable, particularly in light of its ultimate rejection of his "secret deal" argument.  Thus, Johnson is not entitled to habeas relief on this final claim.

## IV.  CONCLUSION

For the foregoing reasons, Johnson's various habeas claims are without merit. Johnson's requests for discovery and an evidentiary hearing are also unavailing since the state courts adjudicated his claims on the merits, and this Court has now upheld those determinations. *See* R. 38 at 9-11 (citing and discussing *Pinholster*, 563 U.S. at 181).

The only remaining matter then is whether this Court should issue a certificate of appealability with respect to any of Johnson's claims.  According to Rule 11(a) of the Rules Governing Section 2254 Cases, "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and, if it issues a certificate, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Section 2253(c)(2) then provides that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." The Sixth Circuit has further explained that "[a] petitioner may meet this standard by showing that reasonable jurists could debate whether the petition should have been determined in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

63

Applying this standard, the Court concludes that Johnson has not made a substantial showing of the denial of a constitutional right.  Indeed, Johnson has neither demonstrated that reasonable jurists could debate whether the petition should have been resolved differently nor established that the various issues deserve encouragement to proceed further.  Thus, the Court will deny Johnson a certificate of appealability.

Accordingly, it is **ORDERED** as follows:

1.  Donald Herb Johnson's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 [R. 1] is **DENIED WITH PREJUDICE**.

2.  This action is **DISMISSED** and **STRICKEN** from the Court's docket.

3.  With respect to any appeal, a certificate of appealability is **DENIED**.

4.  The Court will enter a corresponding Judgment.

This 8th day of August, 2022.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY

64